The **CITIZENS COMMITTEE To Preserve the present programming of the "Voice of the Arts in Atlanta on WGKA–AM and FM"**, Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION**, Appellee,

**Strauss Broadcasting Company of Atlanta**, Intervenor.

No. 23515.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1970.

Decided Oct. 30, 1970.

Mr. Henry Angel, Atlanta, Ga., for appellant.

Mr. D. Biard MacGuineas, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Reed Miller, Washington, D. C., with whom Mrs. Anne W. Branscomb, Washington, D. C., was on the brief, for intervenor.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

This proceeding to review an order of the Federal Communications Commission was initiated by a voluntary association of citizens of Atlanta, Georgia. Their concern is with a substantial alteration in the program format incident to a change in ownership of a licensee—a concern which they requested the Commission to explore in an evidentiary hearing before giving its final approval to the transfer. The Commission denied that request, and it is the propriety of that action alone which is presently before us. For the reasons hereinafter appearing, we do not think the omission of a hearing in this instance was compatible with the applicable statutory standards.

## I

On March 5, 1968, the intervenor, Strauss Broadcasting Company of Atlanta, a subsidiary of a Texas organization with radio stations in Dallas and Tucson, filed with the Commission an application for transfer of the operating rights of the Atlanta Stations WGKA–AM and WGKA–FM. The application was founded upon a proposed 100% transfer of the stock ownership of the licensee stations to Strauss from Glenkaren Associates, Inc. Under Glenkaren, the stations had for many years maintained a classical music format,[1] duplicating FM transmissions on AM during the AM daytime operating period. Strauss proposed a format comprised of a "blend of popular favorites, Broadway hits, musical standards, and light classics." With the exception of news broadcasts, there was to be no duplication of AM and FM transmissions under the changed format.

Publication of notice of the transfer application provoked a public outcry against the change in format, including adverse comment in the columns of a leading Atlanta newspaper. More than 2000 persons, by individual letters and group petitions, informally protested the change to the Commission. Subsequently, Strauss filed two amendments to its transfer application. The first, on April 22, 1968, dealt largely with the "newspaper campaign," which was alleged to be responsible for the protests addressed to the Commission. In addition, a detailed explanation of the proposed format was included. Although there was a denial of any purpose to use "rock and roll," "race," "religious," or "country and western" music, there was a reaffirmation that "what we seek to achieve is a pleasant blending of popular favorites, Broad-

---

1. At the oral argument, both the Commission and the intervenor suggested the imprecision of the term "classical music." While an exact verbal definition may be somewhat elusive, this is perhaps a subject matter of which it can also be said that we at least "know it when [we hear] it." *See* Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (Stewart, J. concurring). We note that the Commission, in its initial memorandum opinion approving the transfer, had no apparent difficulty in characterizing WGKA–AM and FM as "the only stations in Atlanta devoting their entire time to the broadcast of *serious classical music.*" (Emphasis supplied).

way hits, musical standards and light classical music," and the amendment went on to say:

"We recognize, of course, that we will be changing the stations from a classical music format. No doubt there is a small (but obviously vocal) segment of the population in Atlanta interested in classical music, but * * * there has not been any general acceptance by the public *or commercial advertisers* of classical music. * * * " (Emphasis supplied).

A second amendment was filed June 3, 1968. It transmitted summaries of interviews with 13 prominent citizens which purported to reflect favorable views of the proposed new format. One such interview with the Sheriff of Fulton County was described in this way:

"Knew nothing about the station, had never heard it and was not aware that there was such a station in Atlanta.

"Very sports minded and listens to sports regularly and could not see where anything could be added * *

" * * * Does not like classical music and prefers old standards and easy moving popular. In his opinion a music format such as we are proposing would be well accepted."

Another community leader interviewed was the executive vice-president of an advertising agency. His views were summarized as follows:

"WGKA has an extremely good image in the market, but actually only appeals to a very small segment of people so that it is no real factor in the market from an advertising standpoint. The station has put itself in this small niche, but he believes if the programming were broadened, it would have appeal for more people."

A third interview, this time with a savings and loan executive, appeared to recognize some merit in WGKA but concluded on this unmistakably dissonant note:

"He stated that WGKA regularly carried a fine arts activity schedule, but that was about the extent of their community involvement. WGKA had done live direct broadcasts of symphonies and certain other programs, but always dealing with classical artists." [2]

On September 4, 1968, the Commission, without a hearing, granted the transfer application. The Commission recited as a fact that the necessity for the transfer was that the existing owner could not supply adequate capital for needed improvements. It also noted that opposition to the change was provoked by the newspaper comments, whereas interviews with community leaders had apparently evoked "nothing but support" for Strauss's proposals. The Commission concluded that the proposed programming was established by the surveys to be one that served the public interest, and that the "informal objections" raised no substantial question requiring a hearing. Commissioner Cox dissented without opinion.

On September 25, 1968, appellant filed a petition for reconsideration, which urged a stay of the September 4 ruling pending the holding of a hearing. Appellant challenged the significance of Strauss's surveys of 13 community leaders, questioning the representative nature of this sampling, and comparing it with the large number of protests actually received by the Commission before its approval order was entered. Perhaps the greatest stress was laid on the fact that of Atlanta's many AM and FM stations, only one (WGKA) was classical.

---

2. The remaining interviewees were the Chief of Police, the County Commissioner, the County Superintendent of Schools, the President of the Chamber of Commerce, the pastor of the First Methodist Church (who was said to interpret classical music "as music that threatens to develop into a tune—but never does"), the chancellor of the Catholic Archdiocese, the rabbi of the Jewish Temple, the City Attorney and Board Chairman of Emory University, a Civil Court Judge, and the president of the Rotary Club.

Strauss countered, on October 9, 1968, with an opposition to the petition, alleging lack of standing on appellant's part, but also renewing its laments about the hostility of the Atlanta newspapers and emphasizing its interviews with the 13 community leaders. In the closing pages of this document, however, Strauss said that "[r]ecognizing the expressed interest of the some 2000 persons who advocated retention of the classical music format, Strauss will, at the outset, emphasize such music on WGKA–FM, particularly during evening hours, while still providing a mix of popular favorites and Broadway hits. * * * "

In subsequent months voluminous papers were filed by both sides.[3] Appellant's first amendment to its petition alleged that intervenor had misrepresented to the Commission the views expressed by the interviewees, and submitted affidavits from six of them which were said to contradict the earlier summaries. Intervenor came back with letters from, or summaries of second interviews with, the interviewees which were said to reaffirm the original summaries.

On March 4, 1969, the Commission requested Strauss to "undertake further efforts to ascertain by a more comprehensive survey" the tastes and needs of the community. In response, Strauss filed on April 30, 1969 a statistical survey of "program preferences" in Atlanta prepared by Marketing and Research Consultants of Dallas. As the Commission describes the matter in its opinion, the key question in this survey was framed in this way:

"Which of these two formats would you prefer to listen to daily?

a. A blend of Broadway Show tunes like "Mame" and "Cabaret," movie themes like "Dr. Zhivago" or "Born Free" and standards like "Moonglow" and "Stardust" plus hourly newscasts.

b. A blend of Opera Symphonic pieces like "The Emperor Concerto" or "The New World Symphony" and Ballets such as "Petrouchka" and "Swan Lake" plus news approximately every hour."

Out of 640 people asked, 73% preferred the first format, and 16% preferred the second. Four% gave no reply, and the remainder preferred neither. Appellant, on May 22, 1969, attacked in detail this submission by Strauss.

At this point, another factor entered the controversy, namely, the existence of a daytime-only 500 watt AM classical station in Decatur, Georgia, (WOMN), some 10 miles from Atlanta. Strauss asserted that this station adequately served the daytime needs of WGKA's former audience. Appellant responded that WOMN's signal reached few Atlanta listeners at an acceptable level of signal quality.

On August 25, 1969, the Commission entered a Memorandum Opinion and Order. The Commission reviewed its previous opinion and intervening events, and concluded that "[t]he case here comes down to a choice of program formats—a choice which in the circumstances is one for the judgment of the licensee." *Inter alia*, the Commission accepted Strauss's surveys, and stated as a fact that WOMN

3. a. Citizens Committee—Amendment to Petition for Reconsideration—October 21, 1968.
b. Citizens Committee—Request for Stay —Oct. 21, 1968.
c. Strauss—Opposition to Request for Stay—Oct. 25, 1968.
d. Strauss—Motion to Strike Amendment—Oct. 31, 1968.
e. Citizens Committee—Opposition to Motion to Strike Amendment—Nov.

f. Citizens Committee—Request for Leave to Amend—Nov. 22, 1968.
g. Strauss—Reply to Opposition to Motion to Strike—Nov. 25, 1968.
h. Citizens Committee—Request for Leave to Amend and Second Amendment to Petition—Dec. 9, 1968.
i. Strauss—Motion to Strike Second Amendment—Dec. 10, 1968.
j. Strauss—Opposition to Request for Leave to Amend—Dec. 10, 1968.

served "a large portion of the City of Atlanta." [4]

In dissent, Commissioner Cox asserted that a hearing was required. He noted that the WGKA stations had been providing classical music for ten years, and had thereby afforded some measure of balance in the musical fare available to Atlanta listeners from the 20 existing aural facilities—a balance which was being destroyed, particularly for daytime listeners. He also noted that by intervenor's own surveys (which he also questioned) one-sixth of the Atlanta market, or about 100,000 people, would not be served despite the existence of multiple radio channels. He characterized the transaction as one promoting only the private interests of the transferor and transferee: Since classical music stations are less profitable than popular stations, Strauss could enter the popular market more cheaply by this means than by purchasing a popular station, and Glenkaren could sell at a higher price than if it were to sell to one intending to continue the classical format. Contrary to the Commission's initial finding, the dissenter characterized the Glenkaren operation as profitable, and said that no change of program format was necessary for financial reasons. He did not see how the requisite public interest finding could be made short of the illumination afforded by a hearing.

## II

In this court appellant advances a number of grounds as invalidating the Commission's action. We think the substantial issue presented is that of the necessity for a hearing.[5] In addressing that question, we look to the statutory context from whence it arises. The Federal Communications Act provides that no license may be transferred "except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(b). An application of this kind is directed to be disposed of as if the transferees were making application for the license under Section 308 of the Act, which covers applications for licenses in the first instance, and modifications or renewals of existing licenses. Section 309(e) of the Act provides that if, in the case of any such application, "a substantial and material question of fact is presented," or the Commission is for any reason unable to make the prescribed finding, "it shall formally designate the application for hearing * * *."

To justify the omission of a hearing in this case, therefore, it is necessary to demonstrate that there were no "material and substantial questions of fact" bearing significantly upon the exercise of the Commission's judgment. In this court, counsel for the Commission has asserted principally the proposition that the Commission has a discretion in these matters which is not to be disturbed unless it is palpably abused. This is, of course, a general truth which needs no demonstration. Its bare assertion does not, how-

---

4. This latter circumstance was thought by the Commission to mitigate significantly Strauss's conceded abandonment of classical music in the daytime and its restriction of its classical offerings to the evening hours on FM. Intervenor began operating the stations on the new format on November 10, 1968; and the record indicates that there is controversy as to how faithfully it has adhered to this stated purpose for the FM channel.

5. Appellant asserts that, because the Commission's order under review was not issued within 90 days of the filing of the petition for reconsideration, see 47 U.S.C. § 405, the order was invalid; and appel-

lant's request for hearing should, accordingly, be taken as granted. We find no merit in this point since it appears that both parties sought, and were given, the opportunity to file additional pleadings, and the Commission was advised that negotiations were in progress seeking a resolution of the controversy by agreement. Under these circumstances the Commission was entitled to think that the statutory time requirement had been waived. Neither do we think that the Commission proceeded improperly in requesting intervenor to supplement its application with additional surveys of community interest.

ever, answer the question of whether that discretion in this particular case was required, prior to its exercise, to be informed as accurately as possible by reliable facts relevant to that exercise. It is in this respect that we query the Commission's conformity with the statutory prescription for the provision of hearings.

The Commission's point of departure seems to be that, if the programming contemplated by intervenor is shown to be favored by a significant number of the residents of Atlanta, then a determination to use that format is a judgment for the broadcaster to make, and not the Commission. Thus, so the argument proceeds, since only some 16% of the residents of Atlanta appear to prefer classical music, there can be no question that the public interest is served if the much larger number remaining are given what they say they like best.

■ In a democracy like ours this might, of course, make perfect sense if there were only one radio channel available to Atlanta. Its rationality becomes less plain when it is remembered that there are some 20 such channels, all owned by the people as a whole, classics lovers and rock enthusiasts alike. The "public interest, convenience, and necessity" can be served in the one case in a way that it cannot be in the other, since it is surely in the public interest, as that was conceived of by a Congress representative of all the people, for all major aspects of contemporary culture to be accommodated by the commonly-owned public resources whenever that is technically and economically feasible.

We do not doubt that, at our present level of civilization, a 16% ratio between devotees of classical music and the rest of the population is about right, for Atlanta as well as other American cities, although Atlanta's devotion to the arts has not only survived the test of shattering adversity but has appeared to grow stronger as well. In Atlanta that 16% still represents a large number of people, and one which may well grow larger under the influence of the efforts and achievements of many distinguished local musical institutions and organizations. But, whether it grows or not, it is a not insignificant portion of the people who make up Atlanta; and their minority position does not exclude them from consideration in such matters as the allocation of radio channels for the greatest good of the greatest number. The Commission's judgmental function does not end simply upon a showing that a numerical majority prefer the Beatles to Beethoven, impressive as that fact may be in the eyes of the advertisers.

The Commission's response in this instance to the 16% figure was to abdicate. The slenderness of that figure was the fact it thought to be conclusive; and, since that fact alone was not seriously disputed by appellant, the Commission appeared to believe that no other disputes of fact justified a hearing. We find that approach untenable, and we turn to the circumstances which, in our view, brought into play the Congressional requirement of a hearing.

In the first place, there is the key assumption by the Commission that transfer of the station licenses was made necessary by the financial necessities of Glenkaren arising from the unprofitability of the existing operation. This assumption appears in the Commission's initial order of approval, without any supporting factual references. In its brief in this court, the Commission refers only to the circumstance that the financial reports of WGKA–AM and FM show that station *expenditures* exceeded *revenues* by a net figure of $20,635 for the six years preceding the proposed transfer.

Appellant asserts, however, that this figure is no fair measure of profitability of operations, since it reflects what are said to have been very substantial capital expenditures in 1967 for the enlargement and improvement of the station's plant. Certainly no accountant would accept this figure alone as an index to operating profitability, and this is pre-

sumably what underlies the dissenting Commissioner's observation that the "stations were profitable, so it cannot be said that a change of format was necessary to keep them alive." The prospect that a change in programming might increase profits does not, as we have suggested above, conclude of its own force the question of who should be the licensee. We, of course, do not presume to know what a hearing might ultimately reveal with respect to Glenkaren's financial situation, but the Commission's flat assumptions about it need a closer look than they have yet had.

A second area of factual inquiry clamoring for the clarifying influence of direct testimony subject to cross-examination is that of the interviews of prominent citizens. When it entered its original order of approval, the Commission had before it, as evidence of community attitudes, only the summaries by the intervenor of its interviews with 13 community leaders. A substantial controversy later developed as to whether these summaries were accurate accounts of what had been said. Appellant, as a supplement to its petition for reconsideration, filed the affidavits of a number of the interviewees, which give a different picture of their position than do the summaries prepared by intervenor. This in turn prompted intervenor to secure and file unsworn letters from the original interviewees which purported to adopt the summaries as correct.

But these last do not in all instances resolve the ambiguities inevitable in this way of trying to establish what a witness said and what his position really was. For example, Mr. Mitchell, the Commissioner of Roads and Revenues of Fulton County, was described in the summary as having said that he did not listen to radio much except for news and sports, but that "WGKA was his wife's favorite station because it had so little commercial." The last paragraph of the summary, however, carries a strong intimation that the Commissioner would like to see the music format changed:

"As to his music preference—His favorite was Lawrence Welk and others that played similar styles. He said he might listen more to a station that played this type of music. \* \* \*"

In his affidavit, Mr. Mitchell says that he was called on the telephone by someone representing Strauss; that he and his wife "have been avid fans for several years of WGKA's classical music programming"; that he did not remember being told of any purpose by Strauss to change the format; and that, if he had been, he would "have stated that he felt it was in the public's interest to continue the classical music format since it is the only such format in this area which is flooded by popular music stations."

In the letter solicited by intervenor, the Commissioner says that the summary is correct as far as he can remember, except for the last paragraph. Mr. Mitchell's last word in this record is:

"As I remember it, you asked me my favorite program and I named Lawrence Welk. If I remember further correctly, I also told you I did not think many of the stations played this type of music. *I think I also told you that I would prefer no change being made in the type of music played by station WGKA.*" (Emphasis supplied.)

This final formulation may suggest that this particular admirer of Lawrence Welk was hardly the "avid fan" of serious classical music referred to in the affidavit, and that it is Mrs. Mitchell who is in charge of the musical interests of this family. But it is certainly far from clear that Mr. Mitchell, although apparently not having much interest in music at all, "champagne" or otherwise, is to be counted as welcoming intervenor's advent in Atlanta.

The Superintendent of the Fulton County Schools was another interviewee who was described in the summary as feeling "that the programming proposed would be well received by Atlantans as there is nothing exactly like that now being done." In his affidavit, however, the Superintendent states that "[s]ome con-

niving individual or individuals has, or have, desecrated my name \* \* \*," and that there "is nothing else in our area which is more uplifting or more needed than is the present programming of 'The Voice of the Arts in Atlanta—WGKA, AM and FM.' " Although solicited by intervenor for a further statement, none was forthcoming.

Rabbi Rothschild was characterized in the summary as saying that he did not listen to the station, but that "his wife listens to it all the time in her car and at home"; and further that "he enjoys popular music and indicated that our proposed format would be well accepted in Atlanta and there was definitely a place for such a station." In his affidavit, the rabbi says that he understood the interview to be of a purely social nature and not directed towards the expression of endorsement or opinion as to the program format; and that it is his opinion that "the community has and would continue to benefit by the existence of WGKA's classical format." In his letter of response to intervenor's later solicitation, he asserts that he had not been acquainted with the purposes of the original interview, and finds nothing in the summary which was intended by him to be an approval of the change in programming.[6]

Appellant urges that discrepancies of this nature demonstrate actual misrepresentation on intervenor's part which disqualifies it from being a licensee. We are not disposed, at least on this record, to attribute such a purpose to intervenor, or to permit appellant's allegations in this regard to play a part in the conclusion we reach as to the proper disposition of this appeal. Confusion, conflict, misunderstanding, obscurity—all are inherent in a process in which the statements and opinions of one individual are sought to be determined from what two adversary parties say that he said or thinks; and the inherent weaknesses of affidavits are demonstrated amply in this record.

The truth is most likely to be refined and discovered in the crucible of an evidentiary hearing; and it is precisely a situation like the one revealed by this record which motivated the Congress to stress the availability to the Commission of the hearing procedure. The controversy that developed in this case is one that characteristically continues to be blurred until it is subjected to the adversary process—inside the hearing room, and not out.

A third important issue which appears to be in dispute is the degree to which daytime listeners in Atlanta are provided with classical music from a non-Atlanta source. This is the question of the scope of the coverage of Atlanta by WOMN, the station located in Decatur, Georgia. The Commission disposed of this matter by saying in a footnote that "a large portion" of the City of Atlanta is reached by this station. Commissioner Cox in his dissent refers to WOMN as providing Atlanta with "some service." Appellant, however, in one of its representations to the Commission, asserted that WOMN broadcasting only on daytime AM and with a weak frequency reaches effectively only "a small portion of the Atlanta area." At the oral argument before us no one appeared to be familiar with the contour charts which would be highly relevant to a reasoned disposition of this question. Since the Commission appears to justify its action in some considerable part by the asserted availability to Atlanta listeners of at least a

---

6. Mr. Bowden, the City Attorney and Emory University Board Chairman, is described in the summary as saying that WGKA "had a good image, but had very limited appeal and a lighter type of music would certainly have more listeners and would be a better useage [sic] of the broadcast channel. \* \* \*" He said in his affidavit, however, that he hoped WGKA's classical music format will be preserved since "he deems it vital to this public's interest;" and that any contrary representation of his opinion would be "misleading and untrue." In the subsequent letter solicited by intervenor, he appears finally to have taken shelter within the generous confines of the proposition that a "radio station should have the right to play any type of music or any type of entertainment it wishes. \* \* \*"

daytime classical format it is obviously important that this dispute of fact be explored and resolved.

 It is, of course, true that a licensee has considerable latitude in the matter of programming; and it is not for the Commission arbitrarily to dictate what the programming content shall be. *See* FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869 (1940). But it is not true that the Commission is devoid of any responsibility whatsoever for programming, or that its concern with it stops whenever 51% of the people in the area are shown to favor a particular format.[7] Had Glenkaren remained the licensee, it could have altered its programming format without the permission of the Commission during the license term, but it would have done so knowing that the change would have been a factor to be weighed when its application for renewal was filed. *See* Office of Communication of United Church of Christ v. F. C. C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). The change proposed to be made by a transferee is similarly relevant to the consideration of a transfer application submitted during the license term. We hold that, in the posture which this record shows the matter to have stood before the Commission, the grant of this application without hearing fell outside the contemplation of the Act.

The order denying reconsideration is vacated and the matter is remanded for an evidentiary hearing.

It is so ordered.

7. The Commission refers in its brief to a number of pronouncements by it and by the courts of its incapacity to be a "national arbiter of taste." Palmetto Broadcasting Co. (WDKD), 33 F.C.C. 250, 257 (1962), reconsideration denied, 34 F.C.C. 101 (1963), affirmed *sub nom.* Robinson v. F.C.C., 118 U.S.App.D.C. 144, 334 F.2d 534 (1964); *and see* Buckley Jaeger Broadcasting Corp. v. F.C.C., 130 U.S. App.D.C. 90, 93, 397 F.2d 651, 654 (1968). But, as the Commission goes on quickly to acknowledge in these words, "[T]his is not to say that a transferee may make wholly indiscriminate program changes." The question is, as here, what are the community needs and will they be properly served by the proposed transfer? The Commission is not dictating tastes when it seeks to discover what they presently are, and then to consider what assignment of channels is feasible and fair in terms of their gratification.