The CITIZENS COMMITTEE TO KEEP
PROGRESSIVE ROCK, Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Midwestern Broadcasting Company,
Intervenor.

No. 72-1675.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 5, 1973.

Decided May 4, 1973.

As Amended May 11, 1973.

station WGLN (FM), Sylvania, Ohio, from Twin States Broadcasting, Inc., to Midwestern Broadcasting Corp., brings this appeal from an order of the Federal Communications Commission [hereinafter "Commission"] affirming a prior grant of the assignment application. The primary issue [1] raised by appellant concerns the statutory requirement for a hearing whenever "substantial and material question[s] of fact" are raised regarding the application. 47 U.S.C. § 309(e) (1970). Contrary to the Commission's determination we find that there are substantial and material factual questions at issue rendering a hearing necessary prior to resolution of the application. We reverse the order of the Commission and remand for such a hearing.

Tracy A. Westen, Washington, D. C., for appellant.

R. Michael Senkowski, Counsel, F. C. C. with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., were on the brief, for appellee.

Stanley B. Cohen, Washington, D. C., with whom Ian D. Volner, Washington, D. C., was on the brief for intervenor.

Before McGOWAN and TAMM, Circuit Judges, and WILLIAM J. JAMESON,* Senior United States District Judge for the District of Montana.

TAMM, Circuit Judge:

Appellant, a citizens committee organized to contest the assignment of radio

## I.

WGLN (FM) began operation on November 29, 1968, as a "country and western" music station licensed to Twin States Broadcasting, Inc. Twin States' application for construction and license stated that "although the applicant proposes to principally serve Sylvania [a small Ohio "bedroom" suburban community on the outskirts of Toledo],[2] which has no other broadcast station licensed to serve it at the present time, the applicant believes that it also has the responsibility to serve the program needs of the remainder of its service area." Thus, although its primary service obligation was to its principal city of license, Sylvania, Twin States recognized a secondary responsibility to service the effective area of its signal, including other suburban communities and at minimum a significant portion of Toledo proper.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. We reject appellant's argument that the Commission erred in refusing to order a hearing to determine whether the assignee of WGLN (FM) misrepresented its programming plans to its employees and the community of license in order to forestall protests.

2. The channel applied for, 288A, was assigned to the city of Toledo. 47 C.F.R. § 73.202(b). It was available for use at Sylvania, however, pursuant to 47 C.F.R. § 73.203(b), the "25 mile rule." The "rule" was amended effective June 4, 1968. *See* 33 Fed.Reg. 6663 (May 1, 1968).

Following renewal of its license in 1970,[3] in March of 1971 WGLN (FM) altered its programming to a commercialized format of "golden oldies." Finding neither format economically successful and suffering significant losses in its investment,[4] on August 12, 1971, Twin States sought Commission consent to assignment of the license to Midwestern Broadcasting Corp. The proposed assignee, which also owned a highly successful "top forty" music station licensed to Toledo, WOHO (AM), stated in the assignment application that it proposed to program "generally middle of the road music which may include some contemporary, folk and jazz, similar to what [the] station is currently programming."[5] The assignee proposed to serve the city of license and other suburban communities in the greater Toledo metropolitan area.

On August 31, 1971, while the application for assignment was still pending before the Commission, WGLN (FM) began experimentation with a "progressive rock" music program for several hours late each evening. The unprecedented success of the program led to the eventual complete change of the format to "progressive rock" on October 15, 1971.

On February 23, 1972, the Commission without the benefit of a hearing found that the "grant of [the WGLN (FM) assignment] application will serve the public interest, convenience and necessity," and released an order granting the application. Shortly thereafter it became evident to the individuals who now make up the Citizens Committee that the "progressive rock" format which they so dearly cherished was to be abandoned. The Committee was formed, petitions calling for the retention of the "progressive rock" format circulated, and on March 27, 1971, a Petition for Stay, Reconsideration and Permanent Denial of Assignment Application was filed with the Commission. The Committee's main contention was that since the "progressive rock" format of WGLN (FM) was unique to the Toledo area, and since a significant portion of the "residents of the metropolitan Toledo area" (as evidenced by more than 11,000 petition signatures ultimately garnered and submitted) desired retention of the format, this court's decision in Citizens Committee v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970), mandated a hearing to examine the public interest implications of the proposal to convert the communities' only "progressive rock" music station into one of several "middle of the road" stations. The Commission, for reasons we now deem unpersuasive, denied the Petition and affirmed its original order. Twin States Broadcasting, Inc., 35 F.C.C.2d 969 (1972).

WGLN (FM) has since changed its call letters to WXEZ (FM), moved its studios to those of WOHO (AM) in Oregon, Ohio, and provides the same "middle of the road" format that is now offered to the Toledo environs by at least six other licensees.

## II.

In *Citizens Committee* we held that the public has an interest in diversity of entertainment formats and therefore that format changes can be detri-

---

3. The application for license renewal was filed on July 6, 1970, and stated at Exhibit 2A, in response to Part 1, Section IV(A), sentence (1)(A)(2) of the application: "The principal community served by the station is the community of Sylvania, Ohio (population 5,137), and the surrounding county of Lucas, Ohio (population 456,931), including the city of Toledo, Ohio (population 365,000)." Renewal was granted effective October 29, 1970 through October 1, 1973.

4. The licensee experienced an operating cash profit of $2,036.00 in 1969, a loss of $27,072.00 in 1970, and a loss of $21,901.00 during the first six months of 1971. Jt.App. at 84.

5. Jt.App. at 24. We agree with the Commission that the similarity between a "golden oldies" and "middle of the road" format voids appellant's argument that this is a misrepresentation. *See* Twin States Broadcasting, Inc., 35 F.C.C.2d 969, 972 (1972).

mental to the public interest. Consequently, in compliance with its statutory mandate to approve only those assignment applications which it finds to serve the public interest, convenience, and necessity, 47 U.S.C. § 309(a)(1970), the Commission must consider format changes and their effect upon the desired diversity.

The majority of format changes do not diminish the diversity available, and are thus left to the give and take of each market environment and the business judgment of the licensee. *See* WCAB, Inc., 27 F.C.C.2d 743, 746 (1971), *and* Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408 (1972).[6] *Citizens Committee* dealt with the specialized situation where the format to be discontinued, "classical music," was apparently unique to the area while the proposed format, "middle of the road," was not. A "not insignificant portion" (sixteen per cent) of the area's residents desired retention of the unique format, and we stated, 436 F.2d at 269:

> [I]t is surely in the public interest, as that was conceived of by a Congress representative of all the people, for all major aspects of contemporary culture to be accommodated by the commonly-owned public resources whenever that is technically and economically feasible.

In essence, one man's Bread is the next man's Bach, Bacharach, or Buck Owens and the Buckeroos, and where "technically and economically feasible," it is in the public's best interest to have all segments represented.[7]

Having thus raised format change to a public interest level, in *Citizens Committee* we went on to find factual disputes concerning (a) the financial necessity for the format change, (b) the accuracy of interviews with prominent citizens pertaining to the retention of the classical music format, and (c) the extent to which daytime listeners in Atlanta (the city of license) were provided with classical music from a non-Atlanta source. Since the format change was an issue to be considered in determining whether the assignment application was in the public interest, these factual disputes became "substantial and material" and 47 U.S.C. § 309(e) (1970) required a hearing.

Not too surprisingly, *Citizens Committee* has become the object of dichotomous interpretation. The Commission,

---

6. It makes no practical difference whether an adequate listening alternative is considered one of many elements (although undoubtedly the most important, and normally the conclusive element) to be considered by the Commission, or as a factor that renders inapplicable the entire *Citizens Committee* rationale. In either instance, the presence and adequacy of the alternative source is a material issue. *See* Keyes Corp., 31 F.C.C.2d 32, 38 (1971):
  > It has been fully demonstrated that other stations serving the community of Canton carry substantially the same entertainment format as that presently carried by WNYN-FM and that, in consequence, its proposed change of format will not result in the elimination of the only station providing "quiet pool" entertainment fare. The assignee proposes contemporary popular music and standard popular music from the past. Thus, there is considerable doubt whether the doctrine of the *Citizens'*

*Committee Case* even comes into play. However, even if the doctrine of that case were to be applied here, the application establishes beyond a doubt that the assignee's proposals, as described above, are designed to serve the needs and interests of Canton and that the tastes of Canton for entertainment programming will continue to be met. (Footnote omitted.)
  *See also* Biola Schools and Colleges, Inc., 29 F.C.C.2d 787 (1971).

7. This assumes, of course, that a "significant minority" voices support for the format to be discontinued. *De minimis non curant arbitri*, but neither may the Commission ignore a minority's petitions nor should it establish a quantitative minimum. Each situation is different and should be treated as such. Certainly the degree of support for retention of a unique format can be of critical importance in what otherwise are "close cases."

on the one hand, recognized *Citizens Committee* (and subsequently a summary reversal based thereon in Citizens Committee to Preserve the Present Programming of WONO (FM) v. FCC, No. 71–1336 (D.C.Cir. May 13, 1971)) to such an extent that in its Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 680 (1971), it stated:

> [A]ny application involving a *substantial change in program format*— including assignment and transfer applications (where this type of question has usually arisen) and also applications for renewal or major changes in facilities if they involve a basic programming change—will be scrutinized in light of [the *Citizens Committee*] decision; and applicants should be prepared to support their proposals to change formats in light of the needs and tastes of the community and the types of programming available from other stations. A careful reading of this decision is recommended. (Footnote omitted.)

It is our distinct impression, however, based on the briefs and oral arguments in the case *sub judice* and Lakewood Broadcasting Service, Inc., et al., v. FCC, 156 U.S.App.D.C. ——, 478 F.2d 926 (1973), also issued today, that the Commission desires as limiting an interpretation as is possible. We suspect, not altogether facetiously, that the Commission would be more than willing to limit the precedential effect of *Citizens Committee* to cases involving Atlanta classical music stations. On the other hand, voices have been heard, *see* dissenting opinion of Commissioner Johnson in this case, 35 F.C.C.2d at 973, espousing a more liberal interpretation—one holding that any format change diminishing the diversity available automatically gives rise to a hearing.

■ We treat format changes no differently from any other element affecting public interest. If there are factual disputes, as there were in *Citizens Committee*, then a hearing must be held. If there are none—for instance the financial viability of the existing format and the alternative sources of that format may be undisputed,[8] so that the Commission is faced only with balancing the competing interests with known and unchallenged[9] factors, and thus determines where the public interest lies— then no hearing is required.

■ In Hartford Communications Committee v. FCC, *supra*, we were presented with allegations running to (1) the financial qualifications of a proposed assignee, and (2) diminution of service, issues long considered in the public's interest, yet we did not grant appellant's request for a Commission hearing because we found no substantial factual dispute as to those material issues. The dispute concerned the interpretation from a public interest posture to be given the indisputable facts. That determination was for the Commission to make and did not require a hearing. *See* Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S.App.D.C. 146, 403 F.2d 169, 171 (1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969). An identical procedure is applicable for format change considerations. When we say that a format change is of public interest proportions we mean that it must be considered by the Commission in its ultimate determination of public interest, and thus will be an element scrutinized by this court when called upon to exercise its review. If none of the issues pertaining to the

8. We assume that all other issues relevant to the format change determination are likewise undisputed.

9. "Unchallenged" is tempered with acknowledgement that "[c]ontradictory allegations and affidavits which create some possibly unresolved factual issue do not invariably necessitate an evidentiary hearing before the Commission can judge whether an assignment would be in the public interest." Broadcast Enterprises, Inc. v. FCC, 129 U.S.App. D.C. 68, 390 F.2d 483, 485 (1968).

format change are substantially in dispute, however, no hearing need be held.[10]

Thus, the proposed format change before us should have been surveyed by the Commission, and we must look to the record to determine if any substantial and material issues of fact are present.

### III.

The Commission's decision views "the facts here as very much analogous to those which were before the Commission in WCAB, Inc., 21 RR2d 146, 27 FCC2d 743 (1971)." 35 F.C.C.2d at 970. In WCAB, however, there was no dispute that under a "progressive rock" format the licensee had suffered and continued to suffer serious financial losses. In addition, there was no dispute that an alternative source of the format, WZMF (FM) licensed to Menomonie Falls, Wisconsin, was available to Milwaukee area residents. Those issues are disputed here.

While it is true that financial difficulties were experienced under the "country and western" and "golden oldies" format, appellant has produced numerous affidavits of station employees and sales personnel to the effect that the "progressive rock" format was rapidly achieving financial viability. Hooper surveys for November–December, 1971, and January–February, 1972, showed substantial audience gains during all programming segments, and the station had risen to middle ranking in the twelve station market between 3:00 p. m. and 12:00 p. m.[11] More importantly, the rate card was adjusted upward from $2.80 per sixty second announcement to $14.00,[12] and a "no cut" policy was adopted and faithfully observed. The financial losses of the licensee under the prior formats are relevant, inter alia, to suspension of the "three year rule," [13] but not directly to the format change aspect of the public interest determination.[14] The question is not whether the licensee is in such dire financial straits that an assignment should be granted, but whether the format is so economically unfeasible that an assignment encompassing a format change should be granted. WCAB represented a case of known economic unfeasibility. Contrariwise, here there exists a legitimate dispute concerning the

---

10. See Lakewood Broadcasting Service, Inc. et al., 156 U.S.App.D.C. ——, 478 F. 2d 919 (1973).

11. See affidavit of Dorian Paster, Jt.App. at 150, 155, 157, which was included with appellant's Petition for Reconsideration.

12. See affidavit of Charles Schmitt, former sales manager for WGLN (FM), Jt.App. at 164, 166, which was included with appellant's Petition for Reconsideration. See also affidavit of Richard Bird, Jr., former public affairs director for WGLN (FM), Jt.App. at 176. The affidavits submitted with appellant's Petition for Reconsideration generally speak of the improved status of WGLN (FM) since the adoption of the "progressive rock" format, but also contain statements indicating that the station was not as financially sound as it should be, or would be in the future.

13. 47 C.F.R. § 1.597(a) provides that unless the "assignor . . . has made an affirmative factual showing, supported by affidavits of a person or persons with personal knowledge thereof, which establishes that (due to unavailability of capital . . .) Commission consent to the proposed assignment or transfer of control will serve the public interest, convenience and necessity," then if the station involved in a proposed assignment "has been operated by the proposed assignor . . . for less than three successive years, the application will be designated for hearing" pursuant to 47 U.S.C. § 309(e) (1970).

The test is generally whether the assignor has made a sufficient showing that he is not "trafficking in broadcast licenses." 35 F.C.C.2d at 972.

14. It is possible, although not probable, that a licensee could suffer such financial losses under prior formats that a newly found profitable format will be too little too late. In the event that no purchaser can be found willing to program the new economically feasible format (equally unlikely), and the public is thus faced with abandonment of the channel altogether, the financial losses of the licensee under prior formats would have to be considered relevant to the format change determination.

viability of a "progressive rock" format, and the past difficulties under other formats are only minimally relevant. As appellant aptly points out in its brief, "[t]he question before the Commission is not whether WGLN (FM)'s prior format was profitable in the past, but whether progressive rock as a format has been, and is now, 'economically feasible.' "[15]

The supposed *WCAB* analogy is equally inapplicable from an alternative source viewpoint. While two "top forty" formats now service the Toledo area there has been no showing, at least on the record,[16] that an alternative source of "progressive rock" is available. The implied Commission assertion that one is available—through reference to *WCAB*, and by the nunc pro tunc assertion in the Memorandum Opinion and Order denying appellant's motion for stay, August 8, 1972,[17] that "Toledo presently has two stations utilizing a 'Top Forty' entertainment format which, though not devoted exclusively to petitioners' tastes, include some 'progressive rock' music" —is in the face of contrary allegations by the appellant that raise material issues of fact which must be explored in a hearing. We deal here with format, not occasional duplication of selections.

Finally, the Commission attempts to support its conclusion by reference to the fact that WGLN (FM) is the only station licensed to Sylvania, that we stated in *Citizens Committee* that "if there were only one radio channel available to Atlanta" the result therein might have been different, 436 F.2d at 269, and that the vast majority of petition signatures were those of Toledo rather than Sylvania residents.[18]

WGLN (FM)'s city of license is its primary obligation. In considering the needs of the community it must stress those of Sylvania and program accordingly. A licensee's obligations do not end there, however, and a secondary ob-

15. Brief for Appellant at 32.

16. At oral argument reference was made by counsel for the Commission and Intervenor to a new "progressive rock" station servicing the Toledo metropolitan area. This is a matter for the Commission's consideration on remand.

17. The Commission's original decision was released on June 30, 1972, and is reported at 35 F.C.C.2d 969. Later, on August 8, 1972, Commissioners Robert E. Lee and H. Rex Lee, "acting as a Board," adopted an opinion and order denying appellant's motion for stay of the effective date of the Commission's earlier order. Jt.App. at 288. In this second opinion the Commission for the first time distinguished the *Citizens Committee* case on the grounds that WGLN (FM) was Sylvania's only station, and that alternative sources of "progressive rock" were available. Appellant contends that this second opinion and order cannot be considered when reviewing the Commission decision to grant the application. We find the Commission decision defective even if we consider the reasons set out in the second opinion, and so we need not decide the issue.

18. Appellant circulated petitions with the following heading:

We the people of the community know [sic] as Toledo, Ohio:

Protest the elimination of programming dedicated to progressive rock and public affairs serving our community as formerly presented by station WGLN-FM. We the citizens oppose the approval of transfer of frequency 105.5 FM to Lewis Dickey, president of Midwestern Broadcasting and owner of WOHO-AM.

We feel the interest of the public will best be served by an independent broadcaster using the same broadcasting principles established by WGLN prior to the takeover and elimination by Midwestern Broadcasting.

Petition sponsored by Citizens Committee to Keep Progressive Rock!

Jt.App. at 187. Appellant asserts that 11,122 signatures "from the greater Toledo, Ohio, area" have been submitted to the Commission. Despite the language of the heading it is clear from the record that the petitions did include signatures of non-Toledo residents, although the exact number is questioned. Appellant stated in its Reply Brief in the Commission proceedings, Jt.App. at 237, that "a substantial percentage of the signers are residents of Sylvania," and submitted with its Reply Brief the signatures of 188 additional Sylvania residents.

ligation exists to satisfy the demands of the surrounding environs.[19] Recognition of this requirement can be seen in Twin States' application for construction and license, discussed earlier,[20] and in the survey of community leaders. The survey contained in the assignee's application, for example, compiled the results of interviews with eleven Toledo and five Oregon residents, six residents of other suburban communities, and thirty-five Sylvania residents. To the extent that WGLN (FM) secondarily serves Sylvania's neighbors, it is secondarily responsible to them.

More importantly, however, is the degree to which Sylvania is served by the area's other radio stations. WGLN (FM) may be the only channel licensed to Sylvania, but the availability of the multitude of other stations has a distinct bearing upon the format change determination before the Commission. Thus, in *WCAB* an alternative source available in Menomonie Falls eased the way for the format change of a Wauwatosa station serving the entire Milwaukee metropolitan area. Likewise, in *Citizens Committee* we remanded for a hearing to determine the extent to which a non-Atlanta station provided an alternative source of a "classical music" format for Atlanta residents. We realize that the fewer the radio sources the more the tastes of the majority must be recognized, and that some easy listening format could represent the greatest good for the greatest number. Nonetheless, when considering the "greatest good" in this case we cannot ignore the multitude of non-Sylvania stations serving the Sylvania residents.

■ ■ The Commission's reasoning contains an interesting, if unacceptable, inconsistency. The Commission marks Sylvania as the sole city of license in an effort to support its failure to consider the petition signatures of non-Sylvania residents, and to support its disapproval of a specialized format; yet when the issue of alternative listening sources is raised it quickly points to two "top forty" formats offered by stations not licensed to Sylvania. Equally important, of course, is the fact that significant numbers of Sylvania residents did petition for retention of the "progressive rock" format.[21] All things considered, a significant minority of those whom WGLN (FM) was obligated to serve desired retention of the apparently unique format. Change of the format became an issue for the Commission and a hearing was required regarding the disputed facts: alternative sources and economic feasibility. The Commission's failure to recognize its obligation mandates this remand.[22]

---

19. *See* Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 682, question #6 (1971):

> Question: Is an applicant expected to ascertain community problems outside the community of license?
>
> Answer: Yes. Of course, an applicant's principal obligation is to ascertain the problems of his community of license. But he should also ascertain the problems of the other communities that he undertakes to serve, as set forth in his response to Question 1(a)(2) of Section IV-A or IV-B . . . . If an applicant chooses not to serve a major community that falls within his service contours a showing must be submitted explaining why. However, no major city more than 75 miles from the transmitter site need be included in the applicant's ascertainment, even if the station's contours exceed that distance.

20. *See* text at note 2 *supra*, and text of note 3 *supra*.

21. *See* note 18 *supra*.

22. The Commission stated, 35 F.C.C.2d at 971 n. 3:

> It should be noted that WGLN did not have a "Progressive Rock" format when assignee contracted to buy it or when the assignment application was filed. Certainly assignee should not be held responsible for the continuation of a format which was not in existence when it filed its application. This factor clearly distinguishes this case from the decision in Citizens Committee (WGKA) v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970) and where the Court found that there was a sub-

█ If no objection is raised to a format change the Commission may properly assume that the format is acceptable and, so long as all else is in order, it may grant the application.[23] When the public grumbling reaches significant proportions, as here and in *Citizens Committee*, the format change becomes an issue for resolution and hearing procedures are applicable if issues of fact are in dispute. Questions regarding the extent of support for the format themselves may be material, and if substantial then the proper procedure is either a survey of the area residents or a hearing on the issue. Once the factual disputes are exposed and a hearing held the Commission's decision regarding the public interest must be reasoned and based upon substantial evidence. Failure to hold a required hearing or failure to render a reasoned decision will be, as always, reversible error. No more is required, no less is accepted.[24]

We recognize that in reviewing the Commission's determinations, even as to whether a hearing should be held, our scope of review is limited. *See* West Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 396 F.2d 688 (1968), *and* Southwestern Operating Co. v. FCC, 122 U.S.App.D.C. 137, 351 F.2d 834 (1965).[25] The failure to hold evidentiary hearings herein simply cannot pass muster even under the limited test we impose, and so the Commission's order granting the assignment application of WGLN (FM) and denying appellant's Petition for Reconsideration is

Reversed and remanded for further proceedings consistent with this opinion.

stantial question as to whether the stations were operating at a loss.

We find, as did Commissioner Johnson in his dissent, that the time of adoption of the "progressive rock" format is "a distinction without a difference," 35 F.C.C.2d at 974 n. 2:

The majority attempts to distinguish this case from *Citizens* by pointing out that the current format was not adopted until after Midwestern contracted to buy the station, or even until after the application for approval of the purchase was filed. While this may be a distinction between this case and *Citizens*, it is a distinction without a difference. The relevant question is still whether, given what we know about the current operation of the station and the proposed future operation, the assignment is in the public interest.

Naturally the length of time that a specific format has been on the air is a factor to be considered in the ultimate public interest determination, for it can have a direct bearing on the degree of attachment which the public has to the unique format. It is also relevant to determinations of economic feasibility. *See* WCAB, Inc., 27 F.C.C.2d 743, 746 n. 7 (1971), and Note, The Public Interest in Balanced Programming Content: The Case for FCC Regulation of Broadcasters' Format Changes, 40 Geo.Wash. L.Rev. 933 (1972).

23. Again, Commissioner Johnson dissenting, 35 F.C.C.2d at 974: "Normally, when a station proposes to change a format, it is a matter between it and its community. If no one objects, the Commission assumes—and properly so—that the new format is acceptable."

24. We see no greater difficulty in characterizing "progressive rock" as a format than that present in the characterization of "classical music" as such. *See* Citizens Committee v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263, 265 n. 1 (1970).

25. As we stated in West Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 396 F.2d 688, 691 (1968):

Admittedly, the scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious or unreasonable. And it is clear that the decision of when hearings are necessary or desirable to clarify issues is one which lies in the first instance with the Commission. (Citations omitted.)

*See also* Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408, 411–412 (1972), and the cases cited therein.