FEDERAL COMMUNICATIONS COMMISSION ET AL. *v.*
WNCN LISTENERS GUILD ET AL.

No. 79-824.   Argued November 3, 1980—Decided March 24, 1981*

---

*Together with No. 79-825, *Insilco Broadcasting Corp. et al.* v. *WNCN Listeners Guild et al.;* No. 79-826, *American Broadcasting Cos., Inc., et al.* v. *WNCN Listeners Guild et al.;* and No. 79-827, *National Association of Broadcasters et al.* v. *WNCN Listeners Guild et al.,* also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 604.

*David J. Saylor* argued the cause for petitioners in No. 79–824. With him on the briefs were *Solicitor General McCree, Deputy Solicitor General Claiborne, Stephen M. Shapiro,* and *C. Grey Pash, Jr. Timothy B. Dyk* argued the cause for petitioners in Nos. 79–826 and 79–827. With him on the briefs were *James A. McKenna, Jr., Carl R. Ramey, J. Roger Wollenberg, J. Laurent Scharff, Jack N. Goodman, Ralph E. Goldberg, Eleanor S. Applewhaite,* and *Erwin G. Krasnow. B. Dwight Perry* and *Richard D. Marks* filed briefs for petitioners in No. 79–825.

*Kristin Booth Glen* argued the cause for respondents WNCN Listeners Guild et al. *Wilhelmina Reuben Cooke* argued the cause for respondents Office of Communication

of United Church of Christ et al. With them on the brief were *David M. Rice, Jeffrey H. Olson,* and *Earle K. Moore.*†

JUSTICE WHITE delivered the opinion of the Court.

Sections 309 (a) and 310 (d) of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.* (Act), empower the Federal Communications Commission to grant an application for license transfer [1] or renewal only if it determines that "the public interest, convenience, and necessity" will be served thereby.[2] The issue before us is

†*Daniel J. Popeo* and *Paul D. Kamenar* filed a brief for the Washington Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed (1) by the Attorneys General and other officials for their respective States as follows: *Robert Abrams,* Attorney General of New York, *Shirley Adelson Siegel,* Solicitor General, and *Robert J. Schack,* Assistant Attorney General; *Richard S. Gebelein,* Attorney General of Delaware, and *Regina Mullen Small,* State Solicitor; *Warren Spannaus,* Attorney General of Minnesota; *Richard H. Bryant,* Attorney General of Nevada; *Jeff Bingaman,* Attorney General of New Mexico, and *Robert Hilgendorf,* Deputy Attorney General; *Dennis J. Roberts II,* Attorney General of Rhode Island, and *Susan E. McGuirl,* Deputy Attorney General; *Mark Meierhenry,* Attorney General of South Dakota, and *Judith Atkinson,* Assistant Attorney General; *Slade Gorton,* Attorney General of Washington, and *Thomas L. Boeder,* Senior Assistant Attorney General; (2) by *Andrew Jay Schwartzman* for the American Symphony Orchestra et al.; and (3) by *Charles M. Firestone* for the Consumer Federation of America et al.

[1] We shall refer to transfers and assignments of licenses as "transfers."

[2] Title 47 U. S. C. § 309 (a) provides:

"Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application."

Title 47 U. S. C. § 310 (d) provides in part:

"No construction permit or station license, or any rights thereunder shall be transferred, assigned, or disposed of in any manner, voluntarily or

whether there are circumstances in which the Commission must review past or anticipated changes in a station's entertainment programming when it rules on an application for renewal or transfer of a radio broadcast license. The Commission's present position is that it may rely on market forces to promote diversity in entertainment programming and thus serve the public interest.

This issue arose when, pursuant to its informal rulemaking authority, the Commission issued a "Policy Statement" concluding that the public interest is best served by promoting diversity in entertainment formats through market forces and competition among broadcasters and that a change in entertainment programming is therefore not a material factor that should be considered by the Commission in ruling on an application for license renewal or transfer. Respondents, a number of citizen groups interested in fostering and preserving particular entertainment formats, petitioned for review in the

involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."

The Act requires broadcasting station licensees to apply for license renewal every three years. 47 U. S. C. § 307 (d). It provides that the Commission shall grant the application for renewal if it determines that the public interest, convenience, and necessity will be served thereby. §§ 307 (a), (d), 309 (a).

Section 309 (d) (1) of the Act provides that any party in interest may petition the Commission to deny an application for license transfer or renewal, but the petition must contain specific allegations of fact sufficient to show that granting the application would be "prima facie inconsistent" with the public interest. If the Commission determines on the basis of the application, the pleadings filed, or other matters which it may officially notice that no substantial and material questions of fact are presented, it may grant the application and deny the petition without conducting a hearing. § 309 (d) (2). However, if a substantial and material question of fact is presented or if the Commission is unable to determine that granting the application would be consistent with the public interest, the Commission must conduct a hearing on the application. § 309 (d) (2).

Court of Appeals for the District of Columbia Circuit. That court held that the Commission's Policy Statement violated the Act. We reverse the decision of the Court of Appeals.

## I

Beginning in 1970, in a series of cases involving license transfers,[3] the Court of Appeals for the District of Columbia Circuit gradually developed a set of criteria for determining when the "public-interest" standard requires the Commission to hold a hearing to review proposed changes in entertainment formats.[4] Noting that the aim of the Act is "to secure the maximum benefits of radio to all the people of the United States," *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 217 (1943), the Court of Appeals ruled in 1974 that "preservation of a format [that] would otherwise disappear, although economically and technologically viable and preferred by a significant number of listeners, is generally in the public interest." *Citizens Committee to Save WEFM* v. *FCC,* 165 U. S. App. D. C. 185, 207, 506 F. 2d 246, 268 (en banc). It concluded that a change in format would not present "substantial and material questions of fact" requiring a hearing if (1) notice of the change had not precipitated "significant public grumbling"; (2) the segment of the population preferring the format was too small to be accommodated by available frequencies; (3) there was an adequate substitute

---

[3] *Citizens Committee to Save WEFM* v. *FCC,* 165 U. S. App. D. C. 185, 506 F. 2d 246 (1974) (en banc); *Citizens Committee to Keep Progressive Rock* v. *FCC,* 156 U. S. App. D. C. 16, 478 F. 2d 926 (1973); *Lakewood Broadcasting Service, Inc.* v. *FCC,* 156 U. S. App. D. C. 9, 478 F. 2d 919 (1973); *Hartford Communications Committee* v. *FCC,* 151 U. S. App. D. C. 354, 467 F. 2d 408 (1972); *Citizens Committee to Preserve the Voice of the Arts in Atlanta* v. *FCC,* 141 U. S. App. D. C. 109, 436 F. 2d 263 (1970).

[4] We shall refer to the Court of Appeals' views on when the Commission must review changes in entertainment format as the "format doctrine," and we shall often refer to a change in entertainment programming by a radio broadcaster as a change in format.

in the service area for the format being abandoned;[5] or
(4) the format would be economically unfeasible even if the
station were managed efficiently.[6] The court rejected the
Commission's position that the choice of entertainment for-
mats should be left to the judgment of the licensee,[7] stating
that the Commission's interpretation of the public-interest
standard was contrary to the Act.[8]

In January 1976, the Commission responded to these de-
cisions by undertaking an inquiry into its role in reviewing
format changes.[9] In particular, the Commission sought public

[5] In *Citizens Committee to Save WEFM* v. *FCC*, for example, the court
directed the Commission to consider whether a "fine arts" format was
a reasonable substitute for a classical music format. 165 U. S. App.
D. C., at 203–204, 506 F. 2d, at 264–265. The court observed that 19th-
century classical music and 20th-century classical music could be classified
as different formats, since "the loss of either would unquestionably lessen
diversity." *Id.*, at 204, n. 28, 506 F. 2d, at 265, n. 28.

[6] These criteria were summarized by the Court of Appeals in the opinion
below. 197 U. S. App. D. C. 319, 323–324, 610 F. 2d 838, 842–843 (1979).
It was also stated that the format doctrine logically applies to renewal as
well as transfer applications. The court noted that a midterm format
change would not be considered until the broadcaster applied for license
renewal. *Id.*, at 330, and n. 29, 610 F. 2d, at 849, and n. 29. See also
*Citizens Committee to Preserve the Voice of the Arts in Atlanta* v. *FCC*,
*supra*, at 118, 436 F. 2d, at 272.

[7] See *Citizens Committee to Preserve the Voice of the Arts in Atlanta* v.
*FCC*, *supra*, at 113, 436 F. 2d, at 267. See also 197 U. S. App. D. C., at
330, n. 31, 610 F. 2d, at 849, n. 31.

[8] *Citizens Committee to Save WEFM* v. *FCC*, *supra*, at 207, and n. 34,
506 F. 2d, at 268, and n. 34.

Although the issue before the Court of Appeals in each of the format
cases was whether a hearing was required, the court warned the Commis-
sion in *Citizens Committee to Keep Progressive Rock* that its public-
interest determination would also be subject to judicial review:
"[F]ailure to render a reasoned decision will be, as always, reversible error.
No more is required, no less is accepted." 156 U. S. App. D. C., at 24,
478 F. 2d, at 934.

[9] *Notice of Inquiry, Development of Policy re: Changes in the Enter-
tainment Formats of Broadcast Stations*, 57 F. C. C. 2d 580 (1976).

comment on whether the public interest would be better served by Commission scrutiny of entertainment programming or by reliance on the competitive marketplace.[10]

Following public notice and comment, the Commission issued a Policy Statement [11] pursuant to its rulemaking authority under the Act.[12] The Commission concluded in the Policy Statement that review of format changes was not compelled by the language or history of the Act, would not advance the welfare of the radio-listening public, would pose substantial administrative problems, and would deter innovation in radio programming. In support of its position, the Commission quoted from *FCC* v. *Sanders Brothers Radio Station,* 309 U. S. 470, 475 (1940): "Congress intended to leave competition in the business of broadcasting where it found it, to permit a licensee . . . to survive or succumb according to his ability to make his programs attractive to the public." [13] The Commission also emphasized that a broad-

---

[10] The Commission also invited interested parties to consider the impact of the format doctrine on First Amendment values.

[11] *Memorandum Opinion and Order,* 60 F. C. C. 2d 858 (1976) (*Policy Statement*), reconsideration denied, 66 F. C. C. 2d 78 (1977).

[12] Section 303 (r) of the Act, 47 U. S. C. § 303 (r), provides that "the Commission from time to time, as public convenience, interest, or necessity requires, shall . . . [m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of [the Act]."

[13] The Commission observed that radio broadcasters naturally compete in the area of program formats, since there is virtually no other form of competition available. A staff study of program diversity in major markets supported the Commission's view that competition is effective in promoting diversity in entertainment formats. *Policy Statement, supra,* at 861.

The *Notice of Inquiry* also explained the Commission's reasons for relying on competition to provide diverse entertainment formats:

"Our traditional view has been that the station's entertainment format is a matter best left to the discretion of the licensee or applicant, since he will tend to program to meet certain preferences of the area and fill significant voids which are left by the programming of other stations. The Commission's accumulated experience indicates that . . . [f]requently,

caster is not a common carrier [14] and therefore should not be subjected to a burden similar to the common carrier's obligation to continue to provide service if abandonment of that service would conflict with public convenience or necessity.[15]

The Commission also concluded that practical considerations as well as statutory interpretation supported its reluctance to regulate changes in formats. Such regulation would require the Commission to categorize the formats of a station's prior and subsequent programming to determine whether

---

when a station changes its format, other stations in the area adjust or change their formats in an effort to secure the listenership of the discontinued format." 57 F. C. C. 2d, at 583.

[14] Section 3 (h) of the Act provides that "a person engaged in radio broadcasting shall not . . . be deemed a common carrier." 47 U. S. C. § 153 (h). See also, *FCC* v. *Sanders Brothers Radio Station,* 309 U. S. 470, 474 (1940) ("[B]roadcasters are not common carriers and are not to be dealt with as such. Thus the [Communications] Act recognizes that the field of broadcasting is one of free competition") (footnote omitted).

[15] The Commission discussed the problems arising from "the obligation to continue service" created by the Court of Appeals' format doctrine. The Commission apparently used this phrase to describe those cases in which it thought the Court of Appeals would hold that an application for license transfer or renewal should have been denied because the abandonment of a unique entertainment format was inconsistent with the public interest. Although the format cases only addressed whether a hearing was required, the Court of Appeals implied that in some situations the Commission would be required to deny an application because of a change in entertainment format. See *Citizens Committee to Keep Progressive Rock* v. *FCC,* 156 U. S. App. D. C., at 24, 478 F. 2d, at 934.

The Commission also addressed the "constitutional dimension" of the format doctrine. It concluded that the doctrine would be likely to deter many licensees from experimenting with new forms of entertainment programming, since the licensee could be burdened with the expense of participating in a hearing before the Commission if for some reason it wished to abandon the experimental format. Thus, "[t]he existence of the obligation to continue service . . . inevitably deprives the public of the best efforts of the broadcast industry and results in an inhibition of constitutionally protected forms of communication with no off-setting justifications, either in terms of specific First Amendment or diversity-related values or in broader public interest terms." *Policy Statement, supra,* at 865.

a change in format had occurred; to determine whether the prior format was "unique"; [16] and to weigh the public detriment resulting from the abandonment of a unique format against the public benefit resulting from that change. The Commission emphasized the difficulty of objectively evaluating the strength of listener preferences, of comparing the desire for diversity within a particular type of programming to the desire for a broader range of program formats and of assessing the financial feasibility of a unique format.[17]

Finally, the Commission explained why it believed that market forces were the best available means of producing diversity in entertainment formats. First, in large markets, competition among broadcasters had already produced "an almost bewildering array of diversity" in entertainment formats.[18] Second, format allocation by market forces accommodates listeners' desires for diversity within a given format and also produces a variety of formats.[19] Third, the market is far more flexible than governmental regulation and responds more quickly to changing public tastes. Therefore, the Commission concluded that "the market is the allocation mechanism of preference for entertainment formats, and . . . Commission supervision in this area will not be conducive either to producing program diversity [or] satisfied radio listeners." [20]

---

[16] In the *Notice of Inquiry,* the Commission discussed the difficult task of categorizing formats, noting that the Court of Appeals had suggested in the *WEFM* case that 19th-century classical music should be distinguished from 20th-century classical music. *Notice of Inquiry, supra,* at 583, and n. 2.

[17] *Policy Statement,* 60 F. C. C. 2d, at 862–864.

[18] *Id.,* at 863.

[19] The Commission pointed out that a significant segment of the public may strongly prefer one station to another even if both stations play the same type of music. Although it would be difficult for the Commission to compare the strength of intraformat preferences to the strength of interformat preferences, market forces would naturally respond to intraformat preferences, albeit in an imperfect manner. *Id.,* at 863–864.

[20] *Id.,* at 866, n. 8.

The Court of Appeals, sitting en banc, held that the Commission's policy was contrary to the Act as construed and applied in the court's prior format decisions. 197 U. S. App. D. C. 319, 610 F. 2d 838 (1979). The court questioned whether the Commission had rationally and impartially reexamined its position [21] and particularly criticized the Commission's failure to disclose a staff study on the effectiveness of market allocation of formats before it issued the Policy Statement.[22] The court then responded to the Commission's criticisms of the format doctrine. First, although conceding that market forces generally lead to diversification of formats, it concluded that the market only imperfectly reflects listener preferences [23] and that the Commission is statutorily obli-

[21] The court was of the view that the Commission's "Notice of Inquiry" revealed a substantial bias against the *WEFM* decision, and that the Commission had overstated the administrative problems created by the format doctrine.

[22] The study was released prior to the Commission's denial of reconsideration of its Policy Statement. The court questioned whether the public had had an adequate opportunity to comment on the study but found it unnecessary to consider whether the Policy Statement should be set aside on that ground:

"Petitioners urge this defect as an independent ground for overturning the Commission. We agree that the study does raise serious questions about the overall rationality and fairness of the Commission's decision. However, because certain broader defects, of which the study is symptomatic, are fatal to the Commission's action, we need not decide whether the failure to obtain public comment on the study is itself of sufficient gravity to warrant rejection of the *Policy Statement.*" 197 U. S. App. D. C., at 328, n. 24, 610 F. 2d, at 847, n. 24.

Respondents urge the Court to set aside the Policy Statement because of this alleged procedural error if the Court determines that the Commission's views do not conflict with the Act or the First Amendment. We have considered the submissions of the parties and do not consider the action of the Commission, even if a procedural lapse, to be a sufficient ground for reopening the proceedings before the Commission.

[23] The court observed, as it had in *WEFM*, that because broadcasters rely on advertising revenue they tend to serve persons with large discretionary incomes. 197 U. S. App. D. C., at 332, 610 F. 2d, at 851. The

gated to review format changes whenever there is "strong prima facie evidence that the market has in fact broken down." *Id.*, at 332, 610 F. 2d, at 851. Second, the court stated that the administrative problems posed by the format doctrine were not insurmountable. Hearings would only be required in a small number of cases, and the Commission could cope with problems such as classifying radio format by adopting "a rational classification schema." *Id.*, at 334, 610 F. 2d, at 853. Third, the court observed that the Commission had not demonstrated that the format doctrine would deter innovative programming.[24] Finally, the court explained that it had not directed the Commission to engage in censorship or to impose common carrier obligations on licensees: *WEFM* did not authorize the Commission to interfere with licensee programming choices or to force retention of an existing format; it merely stated that the Commission had the power to consider a station's format in deciding whether license renewal or transfer would be consistent with the public interest. 197 U. S. App. D. C., at 332–333, 610 F. 2d, at 851–852.

Although conceding that it possessed neither the expertise nor the authority to make policy decisions in this area, the Court of Appeals asserted that the format doctrine was "law," not "policy," [25] and was of the view that the Commission had not disproved the factual assumptions underlying the format

dissenting opinion noted that the Commission had not rejected this assumption. *Id.*, at 341, 610 F. 2d, at 861.

[24] The court stated that the Commission's staff study demonstrated that licensees had continued to develop diverse entertainment formats after the *WEFM* decision.

[25] The court acknowledged that Congress had entrusted to the Commission the task of ensuring that license grants are used in the public interest. Nevertheless, the Commission's position on review of entertainment format changes "could not be sustained even when all due deference was given that construction." 197 U. S. App. D. C., at 336, n. 51, 610 F. 2d, at 855, n. 51.

doctrine.[26] Accordingly, the court declared that the Policy Statement was "unavailing and of no force and effect." *Id.*, at 339, 610 F. 2d, at 858.[27]

## II

Rejecting the Commission's reliance on market forces to develop diversity in programming as an unreasonable interpretation of the Act's public-interest standard, the Court of Appeals held that in certain circumstances the Commission is required to regard a change in entertainment format as a substantial and material fact in deciding whether a license renewal or transfer is in the public interest. With all due respect, however, we are unconvinced that the Court of Appeals' format doctrine is compelled by the Act and that the Commission's interpretation of the public-interest standard must therefore be set aside.

It is common ground that the Act does not define the term "public interest, convenience, and necessity." [28] The Court has characterized the public-interest standard of the Act as "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138 (1940). Although it was declared in *National Broad-*

---

[26] The Court of Appeals was not satisfied that the market functioned adequately in every case; nor was it persuaded that the loss of a unique format is comparable to the loss of a favorite station within a particular format.

[27] Two judges dissented, arguing that the Policy Statement should have been upheld, since the Commission had made a reasonable judgment that the format doctrine was unnecessary to further the public interest. A third judge agreed with the dissenters that the majority had not accorded sufficient deference to the Commission's judgment, but concluded that the Commission's order should be vacated so that the record could be reopened to permit public comment on the staff study.

[28] The Act provides in general terms that the Commission shall perform administrative functions "as public convenience, interest, or necessity requires." 47 U. S. C. § 303.

*casting Co.* v. *United States,* that the goal of the Act is "to secure the maximum benefits of radio to all the people of the United States," 319 U. S., at 217, it was also emphasized that Congress had granted the Commission broad discretion in determining how that goal could best be achieved. The Court accordingly declined to substitute its own views on the best method of encouraging effective use of the radio for the views of the Commission. *Id.,* at 218. Similarly, in *FCC* v. *National Citizens Committee for Broadcasting,* 436 U. S. 775 (1978), we deemed the policy of promoting the widest possible dissemination of information from diverse sources to be consistent with both the public-interest standard and the First Amendment, *id.,* at 795, but emphasized the Commission's broad power to regulate in the public interest. We noted that the Act permits the Commission to promulgate "such rules and regulations, . . . not inconsistent with law, as may be necessary to carry out the provisions of [the Act],"[29] and that this general rulemaking authority permits the Commission to implement its view of the public-interest standard of the Act "so long as that view is based on consideration of permissible factors and is otherwise reasonable." *Id.,* at 793.[30] Furthermore, we recognized that the Commission's decisions must sometimes rest on judgment and prediction rather than pure factual determinations. In such cases complete factual support for the Commission's ultimate con-

---

[29] See 47 U. S. C. § 303 (r), quoted in n. 12, *supra.*

[30] Section 10 (e) of the Administrative Procedure Act provides in part: "The reviewing court shall—

.        .        .        .        .

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U. S. C. § 706 (2) (A).

In *FCC* v. *National Citizens Committee for Broadcasting,* we observed that a reviewing court applying this standard " 'is not empowered to substitute its judgment for that of the agency.' " 436 U. S., at 803, quoting *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 416 (1971).

clusions is not required since " 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.' " [31]

The Commission has provided a rational explanation for its conclusion that reliance on the market is the best method of promoting diversity in entertainment formats. The Court of Appeals and the Commission agree that in the vast majority of cases market forces provide sufficient diversity. The Court of Appeals favors Government intervention when there is evidence that market forces have deprived the public of a "unique" format, while the Commission is content to rely on the market, pointing out that in many cases when a station changes its format, other stations will change their formats to attract listeners who preferred the discontinued format. The Court of Appeals places great value on preserving diversity among formats, while the Commission emphasizes the value of intraformat as well as interformat diversity. Finally, the Court of Appeals is convinced that review of format changes would result in a broader range of formats, while the Commission believes that Government intervention is likely to deter innovative programming.

In making these judgments, the Commission has not forsaken its obligation to pursue the public interest. On the contrary, it has assessed the benefits and the harm likely to flow from Government review of entertainment programming, and on balance has concluded that its statutory duties are best fulfilled by not attempting to oversee format changes. This decision was in major part based on predictions as to the probable conduct of licensees and the functioning of the broadcasting market and on the Commission's assessment of its capacity to make the determinations required by the format doctrine. The Commission concluded that " '[e]ven after

---

[31] *FCC* v. *National Citizens Committee for Broadcasting, supra,* at 814, quoting *FPC* v. *Transcontinental Gas Pipe Line Corp.,* 365 U. S. 1, 29 (1961).

all relevant facts ha[d] been fully explored in an evidentiary hearing, [the Commission] would have no assurance that a decision finally reached by [the Commission] would contribute more to listener satisfaction than the result favored by station management.' " *Policy Statement*, 60 F. C. C. 2d 858, 865 (1976). It did not assert that reliance on the marketplace would achieve a perfect correlation between listener preferences and available entertainment programming. Rather, it recognized that a perfect correlation would never be achieved, and it concluded that the marketplace alone could best accommodate the varied and changing tastes of the listening public. These predictions are within the institutional competence of the Commission.

Our opinions have repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference. See, *e. g.*, *FCC* v. *National Citizens Committee for Broadcasting, supra; FCC* v. *WOKO, Inc.,* 329 U. S. 223, 229 (1946). Furthermore, diversity is not the only policy the Commission must consider in fulfilling its responsibilities under the Act. The Commission's implementation of the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals, for "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance." *FCC* v. *National Citizens Committee for Broadcasting, supra,* at 810. The Commission's position on review of format changes reflects a reasonable accommodation of the policy of promoting diversity in programming and the policy of avoiding unnecessary restrictions on licensee discretion. As we see it, the Commission's Policy Statement is in harmony with cases recognizing that the Act seeks to preserve journalistic discretion while promoting the interests of the listening public.[32]

---

[32] See, *e. g.*, *FCC* v. *Midwest Video Corp.,* 440 U. S. 689, 705 (1979) (recognizing the "policy of the Act to preserve editorial control of pro-

The Policy Statement is also consistent with the legislative history of the Act. Although Congress did not consider the precise issue before us, it did consider and reject a proposal to allocate a certain percentage of the stations to particular types of programming.[33] Similarly, one of the bills submitted prior to passage of the Radio Act of 1927 [34] included a provision requiring stations to comply with programming priorities based on subject matter.[35] This provision was eventually deleted since it was considered to border on censorship.[36] Congress subsequently added a section to the Radio Act of 1927 expressly prohibiting censorship, and other "interfer[ence] with the right of free speech by means of radio communication." [37] That section was retained in the Communications Act.[38] As we read the legislative history of the

gramming in the licensee"); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 120 (1973) (discussing the Commission's duty to chart a workable "middle course" to preserve "essentially private broadcast journalism held only broadly accountable to public interest standards").

[33] Congress rejected a proposal to allocate 25% of all radio stations to educational, religious, agricultural, and similar nonprofit associations. See 78 Cong. Rec. 8843–8846 (1934).

[34] 44 Stat. 1162. The Radio Act of 1927 was the predecessor to the Communications Act.

[35] This bill would have required the administrative agency created by the Radio Act of 1927 to prescribe "priorities as to subject matter to be observed by each class of licensed stations." H. R. 7357, 68th Cong., 1st Sess., § 1 (B) (1924).

[36] Hearings on H. R. 5589 before the House Committee on the Merchant Marine and Fisheries, 69th Cong., 1st Sess., 39 (1926).

[37] 44 Stat. 1172–1173. See Hearings on S. 1 and S. 1754 before the Senate Committee on Interstate Commerce, 69th Cong., 1st Sess., 121 (1926); H. R. Conf. Rep. No. 1886, 69th Cong., 2d Sess., 16–19 (1927).

[38] Section 326 of the Act provides:

"Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere

Act, Congress did not unequivocally express its disfavor of entertainment format review by the Commission, but neither is there substantial indication that Congress expected the public-interest standard to *require* format regulation by the Commission. The legislative history of the Act does not support the Court of Appeals and provides insufficient basis for invalidating the agency's construction of the Act.

In the past we have stated that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." [39] Prior to 1970, the Commission consistently stated that the choice of programming formats should be left to the licensee.[40] In 1971, the Commission restated that position but announced that any application for license transfer or renewal involving a substantial change in program format would have to be reviewed in light of the Court of Appeals' decision in *Citizens Committee to Preserve the Voice of the Arts in Atlanta,* 141 U. S. App. D. C. 109, 436 F. 2d 267 (1970), in which the Court of Appeals first articulated the format doctrine.[41] In 1973, in a statement accompanying

---

with the right of free speech by means of radio communication." 47 U. S. C. § 326.

In *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978), the Court concluded that although this section prohibits the Commission from editing proposed broadcasts in advance, it does not preclude subsequent review of program content. *Id.,* at 735, 737.

[39] *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969). See also *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* at 121.

[40] See, *e. g., En Banc Programming Inquiry,* 44 F. C. C. 2303, 2308-2309 (1960); *Bay Radio, Inc.,* 22 F. C. C. 1351, 1364 (1957).

[41] *Primer on Ascertainment of Community Problems by Broadcast Applicants,* 27 F. C. C. 2d 650, 679-680 (1971).

The Commission explained:

"Our view has been that the station's program format is a matter best left to the discretion of the licensee or applicant, since as a matter of public acceptance and economic necessity he will tend to program to meet the

the grant of the transfer application that was later challenged in *WEFM*, a majority of the Commissioners joined in a commitment to "take an extra hard look at the reasonableness of any proposal which would deprive a community of its only source of a particular type of programming."[42] However, the Commission's later Policy Statement concluded that this approach was "neither administratively tenable nor necessary in the public interest."[43] It is thus apparent that although the Commission was obliged to modify its policies to conform to the Court of Appeals' format doctrine, the Policy Statement reasserted the Commission's traditional preference for achieving diversity in entertainment programming through market forces.

---

preferences of the area and fill whatever void is left by the programming of other stations." *Id.,* at 679.

The Commission noted that this policy only applied to entertainment programming. "It does not include matters such as an increase in commercial matter or decrease in the amount of non-entertainment programming, both of which are subjects of review and concern, and have been for some time." *Id.,* at 679, n. 15.

The Commission continues to review nonentertainment programming to some degree. In its memorandum opinion denying reconsideration of the Policy Statement, the Commission explained that it has limited its review of programming to preserve licensee discretion in this area:

"To the extent that the Commission exercises some direct control of programming, it is primarily through the fairness doctrine and political broadcasting rules pursuant to Section 315. In both cases the Commission's role is limited to directing the licensee to broadcast some *additional* material so as not to completely ignore the viewpoints of others in the community. . . . These regulations are extremely narrow, the Commission's role is limited by strictly defined standards, and the licensee is left with virtually unrestricted discretion in programming most of the broadcast day. In contrast, [under the format doctrine] we would be faced with the prospect of rejecting virtually the entire broadcast schedule proposed by the private licensee . . . ." 66 F. C. C. 2d, at 83.

[42] *Zenith Radio Corp.,* 40 F. C. C. 2d 223, 231 (1973) (additional views of Chairman Burch).

[43] *Policy Statement,* 60 F. C. C. 2d, at 866, n. 8.

## III

It is contended that rather than carrying out its duty to make a particularized public-interest determination on every application that comes before it, the Commission, by invariably relying on market forces, merely assumes that the public interest will be served by changes in entertainment format. Surely, it is argued, there will be some format changes that will be so detrimental to the public interest that inflexible application of the Commission's Policy Statement would be inconsistent with the Commission's duties. But radio broadcasters are not required to seek permission to make format changes. The issue of past or contemplated entertainment format changes arises in the courses of renewal and transfer proceedings; if such an application is approved, the Commission does not merely assume but affirmatively determines that the requested renewal or transfer will serve the public interest.

Under its present policy, the Commission determines whether a renewal or transfer will serve the public interest without reviewing past or proposed changes in entertainment format. This policy is based on the Commission's judgment that market forces, although they operate imperfectly, not only will more reliably respond to listener preference than would format oversight by the Commission but also will serve the end of increasing diversity in entertainment programming. This Court has approved of the Commission's goal of promoting diversity in radio programming, *FCC* v. *Midwest Video Corp.*, 440 U. S. 689, 699 (1979), but the Commission is nevertheless vested with broad discretion in determining how much weight should be given to that goal and what policies should be pursued in promoting it. The Act itself, of course, does not specify how the Commission should make its public-interest determinations.

A major underpinning of its Policy Statement is the Commission's conviction, rooted in its experience, that renewal

and transfer cases should not turn on the Commission's presuming to grasp, measure, and weigh the elusive and difficult factors involved in determining the acceptability of changes in entertainment format. To assess whether the elimination of a particular "unique" entertainment format would serve the public interest, the Commission would have to consider the benefit as well as the detriment that would result from the change. Necessarily, the Commission would take into consideration not only the number of listeners who favor the old and the new programming but also the intensity of their preferences. It would also consider the effect of the format change on diversity within formats as well as on diversity among formats. The Commission is convinced that its judgments in these respects would be subjective in large measure and would only approximately serve the public interest. It is also convinced that the market, although imperfect, would serve the public interest as well or better by responding quickly to changing preferences and by inviting experimentation with new types of programming. Those who would overturn the Commission's Policy Statement do not take adequate account of these considerations.[44]

It is also contended that since the Commission has re-

---

[44] It is asserted that the Policy Statement violates the Act because it does not contain a "safety valve" procedure. The dissent relies primarily on *National Broadcasting Co.* v. *United States,* 319 U. S. 190 (1943), and *United States* v. *Storer Broadcasting Co.,* 351 U. S. 192 (1956). In *National Broadcasting Co.* v. *United States,* the Court noted that license applicants had been advised by the Commission that they could call to its attention any reason why the challenged chain broadcasting rule should be modified or held inapplicable to their situations. 319 U. S., at 207. In *United States* v. *Storer Broadcasting Co.,* the Court observed that under the Commission's regulations, an applicant who alleged "adequate reasons why the [Multiple Ownership] Rules should be waived or amended" would be granted a hearing. 351 U. S., at 205. In each case the Court considered the validity of the challenged rules in light of the flexibility provided by the procedures. However, it did not hold that the Commission may never adopt a rule that lacks a waiver provision.

sponded to listener complaints about nonentertainment programming, it should also review challenged changes in entertainment formats.[45]   But the difference between the Commission's treatment of nonentertainment programming and its treatment of entertainment programming is not as pronounced as it may seem.   Even in the area of nonentertainment programming, the Commission has afforded licensees broad discretion in selecting programs.   Thus, the Commission has stated that "a substantial and material question of fact [requiring an evidentiary hearing] is raised *only* when it appears that the licensee has abused its broad discretion by acting unreasonably or in bad faith."   *Mississippi Authority for Educational TV*, 71 F. C. C. 2d 1296, 1308 (1979). Furthermore, we note that the Commission has recently reexamined its regulation of commercial radio broadcasting in light of changes in the structure of the radio industry.   See *Notice of Inquiry and Proposed Rulemaking, In the Matter of Deregulation of Radio*, 73 F. C. C. 2d 457 (1979).   As a result of that re-examination, it has eliminated rules requiring maintenance of comprehensive program logs, guidelines on

---

[45] The Commission in the past has sought to promote "balanced" radio programming, but these efforts did not involve Commission review of changes in entertainment format.   For example, in the *En Banc Programming Inquiry*, 44 F. C. C. 2303 (1960), relied on by the dissent, the Commission identified 14 types of programming that it considered "major elements usually necessary to meet the public interest."   *Id.*, at 2314. One of these categories was "entertainment programs."   The Commission suggested only that a licensee should usually provide some entertainment programming: it did not require licensees to provide specific types of entertainment programming.   Moreover, the Commission emphasized that a licensee is afforded broad discretion in determining what programs should be offered to the public:

"The ascertainment of the needed elements of the broadcast matter to be provided by a particular licensee for the audience he is obligated to serve remains primarily the function of the licensee.   His honest and prudent judgments will be accorded great weight by the Commission.   Indeed, any other course would tend to substitute the judgment of the Commission for that of the licensee." *Ibid.*

the amount of nonentertainment programming radio stations must offer, formal requirements governing ascertainment of community needs, and guidelines limiting commercial time. See *Deregulation of Radio,* 46 Fed. Reg. 13888 (1981) (to be codified at 47 CFR Parts 0 and 73).

These cases do not require us to consider whether the Commission's present or past policies in the area of nonentertainment programming comply with the Act. We attach some weight to the fact that the Commission has consistently expressed a preference for promoting diversity in entertainment programming through market forces, but our decision ultimately rests on our conclusion that the Commission has provided a reasonable explanation for this preference in its Policy Statement.

We decline to overturn the Commission's Policy Statement, which prefers reliance on market forces to its own attempt to oversee format changes at the behest of disaffected listeners. Of course, the Commission should be alert to the consequences of its policies and should stand ready to alter its rule if necessary to serve the public interest more fully. As we stated in *National Broadcasting Co.* v. *United States:*

"If time and changing circumstances reveal that the 'public interest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations." 319 U. S., at 225.

## IV

Respondents contend that the Court of Appeals' judgment should be affirmed because, even if not violative of the Act, the Policy Statement conflicts with the First Amendment rights of listeners "to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969). *Red Lion* held that the Commission's "fairness doctrine" was consistent with the public-interest standard of the Communica-

tions Act and did not violate the First Amendment, but rather enhanced First Amendment values by promoting "the presentation of vigorous debate of controversial issues of importance and concern to the public." *Id.,* at 385. Although observing that the interests of the people as a whole were promoted by debate of public issues on the radio, we did not imply that the First Amendment grants individual listeners the right to have the Commission review the abandonment of their favorite entertainment programs. The Commission seeks to further the interests of the listening public as a whole by relying on market forces to promote diversity in radio entertainment formats and to satisfy the entertainment preferences of radio listeners.[46] This policy does not conflict with the First Amendment.[47]

Contrary to the judgment of the Court of Appeals, the Commission's Policy Statement is not inconsistent with the Act. It is also a constitutionally permissible means of implementing the public-interest standard of the Act. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Under §§ 309 (a) and 310 (d) of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.*

---

[46] Respondents place particular emphasis on the role of foreign language programming in providing information to non-English-speaking citizens. However, the Policy Statement only applies to entertainment programming. It does not address the broadcaster's obligation to respond to community needs in the area of informational programming. See Tr. of Oral Arg. 81 (remarks of counsel for the Commission).

[47] Cf. *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973) (the First Amendment does not require the Commission to adopt a "fairness doctrine" with respect to paid editorial advertisements).

(Act), the Federal Communications Commission (Commission) may not approve an application for a radio license transfer, assignment, or renewal unless it finds that such change will serve "the public interest, convenience, and necessity."[1] Any party in interest may petition the Commission to deny the application, § 309 (d)(1), and the Commission must hold a hearing if "a substantial and material question of fact is presented," § 309 (d)(2). In my judgment, the Court of Appeals correctly held that in certain limited circumstances, the Commission may be obliged to hold a hearing to consider whether a proposed change in a licensee's entertainment program format is in the "public interest."[2] Accordingly, I would affirm the judgment of the Court of Appeals insofar as it vacated the Commission's "Policy Statement."[3]

I

At the outset, I should point out that my understanding of the Court of Appeals' format cases is very different from the Commission's.[4] Both in its Policy Statement and in its brief before this Court, the Commission has insisted that the format doctrine espoused by the Court of Appeals "favor[s] a system of pervasive governmental regulation,"[5] requiring " 'comprehensive, discriminating, and continuing state surveil-

---

[1] The pertinent portions of 47 U. S. C. §§ 309 (a) and 310 (d) are quoted in the majority opinion, ante, at 584–585, n. 2.

[2] I will follow the majority, see ante, at 586, n. 4, in referring to a broadcaster's change in entertainment programming as a format change.

[3] Memorandum Opinion and Order, 60 F. C. C. 2d 858 (1976) (Policy Statement), reconsideration denied, 66 F. C. C. 2d 78 (1977) (Denial of Reconsideration).

[4] The opinion of the Court traces the development of the Court of Appeals' "format doctrine" and the Commission's "Policy Statement," see ante, at 586–593. I will not repeat that discussion here.

[5] Notice of Inquiry, Development of Policy Re: Changes in the Entertainment Formats of Broadcast Stations, 57 F. C. C. 2d 580, 582 (1976) (Notice of Inquiry).

606

lance.' " [6]    The Commission further contends that enforcement of the format doctrine would impose "common carrier" obligations on broadcasters and substitute for "the imperfect system of free competition . . . a system of broadcast programming by government decree." [7]    Were this an accurate description of the format doctrine I would join the Court in reversing the judgment below.[8]    However, I agree with the Court of Appeals that "the actual features of [its format doctrine] are scarcely visible in [the Commission's] highly-colored portrait." 197 U. S. App. D. C. 319, 332, 610 F. 2d 838, 851 (1979).

In fact, the Court of Appeals accepted the Commission's conclusion that entertainment program formats should ordinarily be left to competitive forces.  The court emphasized that the format doctrine "was *not* intended as an alternative to format allocation by market forces," and "fully recognized that market forces do generally provide diversification of formats." *Ibid.* (Emphasis in original.)    It explained that "the Commission's obligation to consider format issues arises only when there is strong prima facie evidence that the market has in fact broken down," *ibid.*, and suggested that a breakdown in the market may be inferred when notice of a format change "precipitate[s] an outpouring of protest," *id.*, at 323, 610 F. 2d, at 842, or "significant public grumbling," *ibid.*    The Court of Appeals further stated that "[n]o public interest issue is raised if (1) there is an adequate substitute in the service area for the format being abandoned, (2) there

---

[6] *Policy Statement, supra,* at 865 (quoting *Lemon* v. *Kurtzman,* 403 U. S. 602, 619–620 (1971)).

[7] *Denial of Reconsideration, supra,* at 81.

[8] Even the Court of Appeals agreed that "[t]here would no doubt be severe statutory and constitutional difficulties with any system that required intrusive governmental surveillance, dictated programming choices, forced broad access obligations, or imposed an obligation to continue in service under any and all circumstances." 197 U. S. App. D. C. 319, 331–332, 610 F. 2d 838, 850–851 (1979).

is no substantial support for the endangered format as evidenced by an outcry of public protest, (3) the devotees of the endangered format are too few to be served by the available frequencies, or (4) the format is not financially viable." *Id.,* at 332, 610 F. 2d, at 851. Finally, the Court of Appeals indicated that the Commission's obligation to hold an evidentiary hearing is limited to those situations in which the record presents substantial questions of material fact. *Id.,* at 324, 610 F. 2d, at 843.

The Court of Appeals thus made clear that the format doctrine comes into play only in a few limited situations. Consequently, the issue presented by these cases is not whether the Commission may adopt a general policy of relying on licensee discretion and market forces to ensure diversity in entertainment programming formats. Rather, the question before us is whether the Commission may apply its general policy on format changes indiscriminately and without regard to the effect in particular cases.

## II

Although the Act does not define "public interest, convenience, and necessity," it is difficult to quarrel with the basic premise of the Court of Appeals' format cases that the term includes "a concern for diverse entertainment programming." *Id.,* at 323, 610 F. 2d, at 842.[9] This Court has indicated that one of the Act's goals is "to secure the maximum benefits of radio to all the people of the United States." *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 217 (1943).[10]

---

[9] See D. Ginsburg, Regulation of Radio Broadcasting 294 (1979) ("An argument against the desirability of 'diversity' in broadcast programming is difficult to imagine"). See generally Note, A Regulatory Approach to Diversifying Commercial Television Entertainment, 89 Yale L. J. 694 (1980).

[10] Section 303 (g) of the Act, 47 U. S. C. § 303 (g), directs the Commission to "encourage the larger and more effective use of radio in the public interest."

608

And we have recognized "the long-established regulatory goals of . . . diversification of programming." *FCC* v. *Midwest Video Corp.*, 440 U. S. 689, 699 (1979). At the same time, our cases have acknowledged that the Commission enjoys broad discretion in determining how best to accomplish this goal. See *FCC* v. *National Citizens Committee for Broadcasting*, 436 U. S. 775 (1978); *National Broadcasting Co.* v. *United States, supra.* The Commission has concluded that a general policy of relying on market forces is the best method for promoting diversity in entertainment programming formats. As the majority notes, *ante*, at 595, this determination largely rests on the Commission's predictions about licensee behavior and the functioning of the radio broadcasting market.

I agree with the majority that predictions of this sort are within the Commission's institutional competence. I am also willing to assume that a general policy of disregarding format changes in making the "public interest" determination required by the Act is not inconsistent with the Commission's statutory obligation to give individualized consideration to each application. The Commission has broad rulemaking powers under the Act,[11] and we have approved efforts by the Commission to implement the Act's "public interest" requirement through rules and policies of general application. See, *e. g., FCC* v. *National Citizens Committee for Broadcasting, supra; United States* v. *Storer Broadcasting Co.*, 351 U. S. 192 (1956); *National Broadcasting Co.* v. *United States, supra.*

The problem with the particular Policy Statement challenged here, however, is that it lacks the flexibility we have required of such general regulations and policies. See, *e. g., United States* v. *Storer Broadcasting Co., supra; National*

---

[11] The Commission is authorized to promulgate "such rules and regulations . . . not inconsistent with law, as may be necessary to carry out the provisions of [the Act]." 47 U. S. C. § 303 (r).

*Broadcasting Co.* v. *United States, supra.* The Act imposes an affirmative duty on the Commission to make a particularized "public interest" determination for each application that comes before it. As we explained in *National Broadcasting Co.* v. *United States, supra,* at 225, the Commission must, in each case, "exercise an ultimate judgment whether the grant of a license would serve the 'public interest, convenience, or necessity.'" The Policy Statement completely forecloses any possibility that the Commission will re-examine the validity of its general policy on format changes as it applies to particular situations. Thus, even when it can be conclusively demonstrated that a particular radio market does not function in the manner predicted by the Commission, the Policy Statement indicates that the Commission will blindly assume that a proposed format change is in the "public interest." This result would occur even where reliance on the market to ensure format diversity is shown to be misplaced, and where it thus appears that action by the Commission is necessary to promote the public interest in diversity. This outcome is not consistent with the Commission's statutory responsibilities.

Moreover, our cases have indicated that an agency's discretion to proceed in complex areas through general rules is intimately connected to the existence of a "safety valve" procedure that allows the agency to consider applications for exemptions based on special circumstances. See *E. I. du Pont de Nemours & Co.* v. *Train,* 430 U. S. 112, 128 (1977); *Permian Basin Area Rate Cases,* 390 U. S. 747, 771–772 (1968); *FPC* v. *Texaco Inc.,* 377 U. S. 33, 40–41 (1964); *United States* v. *Storer Broadcasting Co., supra,* at 204–205; *National Broadcasting Co.* v. *United States, supra,* at 207, 225. See also *WAIT Radio* v. *FCC,* 135 U. S. App. D. C. 317, 321, 418 F. 2d 1153, 1157 (1969); *American Airlines* v. *CAB,* 123 U. S. App. D. C. 310, 359 F. 2d 624 (en banc), cert. denied, 385 U. S. 843 (1966); *WBEN, Inc.* v. *United States,* 396 F. 2d 601, 618 (CA2), cert. denied, 393 U. S. 914 (1968).

610

For example, in *National Broadcasting Co.* v. *United States, supra,* we upheld the Commission's Chain Broadcasting Regulations, but we emphasized the need for flexibility in administering the rules. We noted that the "Commission provided that 'networks will be given full opportunity, on proper application . . . to call our attention to any reasons why the principle should be modified or held inapplicable.' " *Id.,* at 207. And we concluded:

> "The Commission therefore did not bind itself inflexibly to the licensing policies expressed in the regulations. In each case that comes before it the Commission must still exercise an ultimate judgment whether the grant of a license would serve the 'public interest, convenience, or necessity.' If time and changing circumstances reveal that the 'public interest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations." *Id.,* at 225.

Similarly, in upholding the Commission's Multiple Ownership Rules in *United States* v. *Storer Broadcasting Co., supra,* we noted that the regulations allowed an opportunity for a "full hearing" for applicants "that set out adequate reasons why the Rules should be waived or amended." *Id.,* at 205.[12]

---

[12] The majority argues, *ante,* at 601, n. 44, that although the Court considered the presence of a "safety valve" procedure in upholding the rules challenged in *National Broadcasting Co.* v. *United States* and *United States* v. *Storer Broadcasting Co.,* the Court "did not hold that the Commission may never adopt a rule 'that lacks a waiver provision." Since this general question was not before the Court in those cases, it is hardly surprising that it did not render an advisory opinion to this effect. What is instructive, however, is the majority's inability to explain why a waiver provision was necessary in those cases, but is not required in the instant situation. As the cases cited in text make clear, this Court and the lower federal courts have insisted on a "safety valve" feature in upholding general rules promulgated by a variety of agencies. I believe it is incumbent on those who would depart from this practice to explain their reasoning.

This "safety valve" feature is particularly essential where, as here, the agency's decision that a general policy promotes the public interest is based on predictions and forecasts that by definition lack complete factual support. As the Court of Appeals admonished the Commission in a related context:

"The Commission is charged with administration in the 'public interest.' That an agency may discharge its responsibilities by promulgating rules of general application which, in the overall perspective, establish the 'public interest' for a broad range of situations, does not relieve it of an obligation to seek out the 'public interest' in particular, individualized cases. A general rule implies that a commission need not re-study the entire problem de novo and reconsider policy every time it receives an application for a waiver of the rule. On the other hand, a general rule, deemed valid because its overall objectives are in the public interest, may not be in the 'public interest' if extended to an applicant who proposes a new service that will not undermine the policy, served by the rule, that has been adjudged in the public interest." *WAIT Radio* v. *FCC, supra,* at 321, 418 F. 2d, at 1157.

In my judgment, this requirement of flexibility compels the Commission to provide a procedure through which listeners can attempt to show that a particular radio market differs from the Commission's paradigm, and thereby persuade the Commission to give particularized consideration to a proposed format change. Indeed, until the Policy Statement was published, the Commission had resolved to "take an extra hard look at the reasonableness of any proposal which would deprive a community of its only source of a particular type of programming." [13] As I see it, the Court of Appeals' format doctrine was merely an attempt by that court to de-

---

[13] *Zenith Radio Corp.,* 40 F. C. C. 2d 223, 231 (1973) (additional views of Chairman Burch) (joined by a majority of the Commissioners).

lineate the circumstances in which the Commission must temper its general policy in view of special circumstances. Perhaps the court would have been better advised to leave the task of defining these situations to the Commission.[14] But one need not endorse every feature of the Court of Appeals' approach to conclude that the court correctly invalidated the Commission's Policy Statement because of its omission of a "safety valve" procedure.

This omission is not only a departure from legal precedents; it is also a departure both from the Commission's consistent policies and its admissions here. For the Commission concedes that the radio market is an imperfect reflection of listener preferences,[15] and that listeners have programming interests that may not be reflected in the marketplace. The Commission has long recognized its obligation to examine program formats in making the "public interest" determination required by the Act. As early as 1929, the Commission's predecessor, the Federal Radio Commission, adopted the position that licensees were expected to provide a balanced program schedule designed to serve all substantial groups in their communities. *Great Lakes Broadcasting Co.*, 3 F. R. C. Ann. Rep. 32, 34, rev'd on other grounds, 37 F. 2d 993, cert. dism'd, 281 U. S. 706 (1929). The Commission's famous "Blue Book," [16] published in 1946, reaffirmed the emphasis on a well-balanced program structure and declared that the Commission has "an affirmative duty, in its public interest determinations, to give full consideration to program service." [17] As the Commission explained:

"It has long been an established policy of broadcasters themselves and of the Commission that the American

---

[14] Confronted as it was by the Commission's resistance to its format doctrine, it is easy to understand why the Court of Appeals felt compelled to undertake this task.

[15] *Policy Statement*, 60 F. C. C. 2d, at 863.

[16] Public Service Responsibility of Broadcast Licensees (1946).

[17] *Id.*, at 12.

system of broadcasting must serve significant minorities among our population, and the less dominant needs and tastes which most listeners have from time to time." [18]

This theme was reiterated in the Commission's 1960 Program Statement,[19] which set forth 14 specific categories of programming that were deemed "major elements usually necessary to meet the public interest, needs and desires of the community," [20] and which emphasized the necessity of each broadcaster's programming serving the "tastes and needs" of its local community.[21] To ensure that licensee programming serves the needs of the community, the Commission has, for example, decreed that licensees have a special obligation to provide programs for children, even going so far as to declare that licensees must provide "a reasonable amount of [children's] programming which is designed to educate and inform—and not simply to entertain." [22]

Moreover, in examining renewal applications, the Commission has considered claims that a licensee does not provide adequate children's programming,[23] or programming for women and children,[24] or for a substantial Spanish-American community,[25] or that the licensee has ignored issues of significance to the Negro community,[26] or has not provided programming of specific interest to residents of a particular

[18] *Id.*, at 15.

[19] *En Banc Programming Inquiry,* 44 F. C. C. 2303 (1960).

[20] *Id.*, at 2314

[21] *Id.*, at 2312.

[22] *Children's Television Report and Policy Statement,* 50 F. C. C. 2d 1, 6 (1974).

[23] *Channel 20, Inc.,* 70 F. C. C. 2d 1770 (1979).

[24] *Community Television of Southern California,* 72 F. C. C. 2d 349 (1979).

[25] *Central California Communications Corp.,* 70 F. C. C. 2d 1947 (1979).

[26] *Mississippi Authority for Educational TV,* 71 F. C. C. 2d 1296 (1979); *Alabama Educational Television Comm'n,* 33 F. C. C. 2d 495 (1971), renewal denied, 50 F. C. C. 2d 461 (1975).

614

area.[27] In each case, the Commission reviewed submissions ranging from general summaries to transcripts of programs, to determine whether the licensee's programming met the public-interest standard.

There is an obvious inconsistency between the Commission's recognition that the "public interest" standard requires it to consider licensee programming in the situations described above and its Policy Statement on review of entertainment program formats. Indeed, the sole instance in which the Commission will not consider listener complaints about programming is when they pertain to proposed changes in entertainment program formats. The Policy Statement attempts to explain this exceptional treatment of format changes by drawing a distinction between entertainment and nonentertainment programming. The Policy Statement suggests that the Commission reviews only nonentertainment programming, and even then, only in special circumstances. Thus, the Policy Statement argues that the fairness doctrine and political broadcasting rules issued pursuant to § 315, 47 U. S. C. § 315, allow the Commission to exercise direct con-

[27] *Educational Broadcasting Corp.*, 70 F. C. C. 2d 2204 (1979).

As the majority notes, *ante*, at 602–603, the Commission recently voted to reduce its role in regulating several aspects of commercial radio broadcasting, including regulation of nonentertainment programming. Thus, the Commission has announced its intention of eliminating its current guideline on the amounts of nonentertainment programming that radio stations should air. And the Commission has indicated that petitions to deny license renewals based on only the quantity of a licensee's nonentertainment programming will no longer be sufficient to support a challenge. For example, a petitioner would have to show that a licensee is doing little or no programming responsive to community issues in order to successfully challenge renewal of the license. Nonetheless, the Commission reiterated that nonentertainment programming is still a relevant issue for petitions to deny, that licensees have an obligation to offer nonentertainment programming addressing issues facing the community, and that the Commission will continue to inquire into the reasonableness of licensee programming decisions. See *Deregulation of Radio,* 46 Fed. Reg. 13888, 13890–13897 (1981) (to be codified at 47 CFR Parts 0 and 73).

trol of programming. In these areas, reasons the Statement, the Commission's role "is limited to directing the licensee to broadcast some *additional* material so as not to completely ignore the viewpoints of others in the community." [28] This "limited involvement in licensee decisionmaking in the area of news and public affairs" [29] is contrasted, in the Commission's view, to "the pervasive, censorial nature of the involvement in format regulation." [30] The majority presumably concludes that the Commission has provided a rational explanation for distinguishing between entertainment and nonentertainment programming. With all due respect, I disagree.

In the first place, the distinction the Commission tries to draw between entertainment and nonentertainment programming is questionable. It is not immediately apparent, for example, why children's programming necessarily falls on the "nonentertainment" side of the spectrum, and the Commission has provided no explanation of how it decides the category to which particular programming belongs. Second, I see no reason why the Commission's review of entertainment programming cannot be as limited as its review of nonentertainment programming. Nothing prevents the Commission from limiting its role in reviewing format changes to "directing the licensee to broadcast additional material," thereby ensuring that the viewpoints of listeners who complain about a proposed format change are not completely ignored. Third, and most important, neither the fairness doctrine nor the political broadcasting rules have anything to do with the various situations described above in which the Commission has not hesitated to consider program formats in making the "public interest" determination. The fairness doctrine imposes an obligation on licensees to devote a "reasonable per-

---

[28] *Denial of Reconsideration*, 66 F. C. C. 2d, at 83 (emphasis in original).
[29] *Ibid.*
[30] *Ibid.*

centage" of broadcast time to controversial issues of public importance, and it requires that the coverage be fair in that it accurately reflect the opposing views. See *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969). The political broadcasting rules regulate broadcasts by candidates for federal and nonfederal public office. See *The Law of Political Broadcasting and Cablecasting,* 69 F. C. C. 2d 2209 (1978). The Commission's examination of whether a broadcaster's format includes programming directed at women or at residents of the local community, or its requirement that licensees provide programming designed to serve the unique needs of children, simply has nothing to do with either the fairness doctrine or the political broadcasting rules. Thus, the Commission's purported justification for its inconsistency is no explanation at all, and I am puzzled by the majority's apparent conclusion that it provides a rational basis for the Commission's policy.

The majority attempts to minimize the inconsistency in the Commission's treatment of entertainment and nonentertainment programming by postulating that the difference "is not as pronounced as it may seem," *ante,* at 602. This observation, even if accurate, is simply beside the point. What is germane is the Commission's failure to consider listener complaints about entertainment programming *to* the same extent and in the same manner as it reviews complaints about nonentertainment programming. Thus, whereas the Commission will hold an evidentiary hearing to review complaints about nonentertainment programming where " 'it appears that the licensee has . . . act[ed] unreasonably or in bad faith,' " *ibid.* (quoting *Mississippi Authority for Educational TV,* 71 F. C. C. 2d 1296, 1308 (1979)), the Commission will not consider an identical complaint about a licensee's change in its entertainment programming. As I have indicated, see *supra,* at 614–616, neither the Commission nor the majority is able to offer a satisfactory explanation for this inconsistency.

Nor can the Commission find refuge in its claim that " '[e]ven after all relevant facts [h]ad been fully explored in an evidentiary hearing, [the Commission] would have no assurance that a decision finally reached by [the Commission] would contribute more to listener satisfaction than the result favored by station management.' " *Policy Statement,* 60 F. C. C. 2d 858, 865 (1976), quoting *Notice of Inquiry,* 57 F. C. C. 2d 580, 586 (1976). The same must be true of the decisions the Commission makes after reviewing listener complaints about nonentertainment programming, and I do not see why the Commission finds this result acceptable in one situation but not in the other. Much the same can be said for the majority's suggestion that the Commission should be spared the burden of "presuming to grasp, measure and weigh . . . elusive and difficult factors" such as determining the number of listeners who favor a particular change and measuring the intensity of their preferences, *ante,* at 601. But insofar as the Commission confronts these same "elusive and difficult factors" in reviewing nonentertainment programming, it need only apply the expertise it has acquired in dealing with these problems to review of entertainment programming.

## III

Since I agree with the Court of Appeals that there may be situations in which the Commission is obliged to consider format changes in making the "public interest" determination mandated by the Act, it seems appropriate to comment briefly on the Commission's claim that the " 'acute practical problem[s]' inherent in format regulation render entirely speculative any benefits that such regulation might produce." [31] One of the principal reasons given in the Policy Statement for rejecting entertainment format regulation is that it would be "administratively a fearful and comprehen-

---

[31] Brief for Federal Communications Commission and United States 35.

sive nightmare," [32] that would impose "enormous costs on the participants and the Commission alike." [33]   But at oral argument before the Court of Appeals, Commission counsel conceded that the " 'administrative nightmare' " argument was an " 'exaggeration' " which was not " 'very significant at all' " to the Commission's ultimate conclusion.   197 U. S. App. D. C., at 330, 610 F. 2d, at 849.   The Commission's reliance on claims that its own counsel later concedes to lack merit hardly strengthens one's belief in the rationality of its decisionmaking.

Although it has abandoned the "administrative nightmare" argument before this Court, the Commission nonetheless finds other "intractable" administrative problems in format regulation.   For example, it insists that meaningful classification of radio broadcasts into format types is impractical, and that it is impossible to determine whether a proposed format change is in the public interest because the intensity of listener preferences cannot be measured. [34]   Moreover, the Commission argues that format regulation will discourage licensee innovation and experimentation with formats, and that its effect on format diversity will therefore be counterproductive.

None of these claims has merit.   Broadcasters have operated under the format doctrine during the past 10 years, yet the Commission is unable to show that there has been no innovation and experimentation with formats during this period.   Indeed, a Commission staff study on the effectiveness of market allocation of formats indicates that licensees have been aggressive in developing diverse entertainment formats under the format-doctrine regime. [35]   This "evidence"—

---

[32] *Policy Statement,* 60 F. C. C. 2d, at 865.

[33] *Id.,* at 864.

[34] The Commission also insists that any findings about the financial viability of a particular format would be entirely speculative.

[35] See *Policy Statement, supra,* at 873–881.

a welcome contrast to the Commission's speculation—undermines the Commission's claim that format regulation will disserve the "public interest" because it will inhibit format diversity.

The Commission's claim that it is impossible to classify formats, is largely overcome by the Court of Appeals' suggestion that the Commission could develop "a format taxonomy which, even if imprecise at the margins, would be sustainable so long as not irrational." [36]   197 U. S. App. D. C., at 334, 610 F. 2d, at 853.   Even more telling is the staff study relied on by the Commission to show that there is broad format diversity in major radio markets, for the study used a format classification based on industry practice.[37]   As the Court of Appeals noted, it is somewhat ironic that the Commission had no trouble "endorsing the validity of a study largely premised on classifications it claims are impossible to make." *Ibid.*[38]   To be sure, courts do not sit to second-guess the as-

[36] There have been a number of comments and suggestions about how the Commission might best accomplish this task. See, *e. g.*, 57 F. C. C. 2d, at 587–589 (concurring statement of Commissioner Hooks); D. Ginsburg, *supra* n. 9, at 316; Note, Judicial Review of FCC Program Diversity Regulation, 75 Colum. L. Rev. 401, 436–437 (1975).

The Court of Appeals suggested that the Commission could consider an alternative approach of "dispensing altogether with the need for classifying formats by simply taking the existence of significant and bona fide listener protest as sufficient evidence that the station's endangered programming has certain unique features for which there are no ready substitutes." 197 U. S. App. D. C., at 334, n. 47, 610 F. 2d, at 853, n. 47.   The court indicated that "this approach would focus attention on the essentials of the format doctrine, namely, that when a significant sector of the populace is aggrieved by a planned programming change, this fact raises a legitimate question as to whether the proposed change is in the public interest." *Id.*, at 334–335, n. 47, 610 F. 2d, at 853–854, n. 47.

[37] See *Policy Statement, supra,* at 875–880.

[38] Nor do I find merit in the Commission's claim that there are serious First Amendment problems with format regulation.   In the first place, I see no reason to find constitutional defect in limited review of entertainment formats when no such defect arises with review of nonentertainment

sessments of specialized agencies like the Commission. But where, as here, the agency's position rests on speculations that are refuted by the agency's own administrative record, I am not persuaded that deference is due.[39]

## IV

The Commission's Policy Statement is defective because it lacks a "safety valve" procedure that would allow the necessary flexibility in the application of the Commission's general policy on format changes to particular cases. In my judgment, the Court of Appeals' format doctrine was a permissible attempt by that court to provide the Commission with some guidance regarding the types of situations in which a re-examination of general policy might be necessary. Even if one were to conclude that the Court of Appeals described these situations too specifically, a view I do not share, I still think that the Court of Appeals correctly held that the Commission's Policy Statement must be vacated.

I respectfully dissent.

---

programming. In *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 395 (1969), we held that the Commission does not transgress the First Amendment "in interesting itself in general program format and the kinds of programs broadcast by licensees." Indeed, First Amendment principles, if anything, would support format review as requested by listeners, for as we indicated in *Red Lion* "[i]t is the [First Amendment] right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Id.,* at 390.

[39] All this suggests that the "practical difficulties" the Commission has identified are not intractable, and that these problems could be solved if the Commission channelled as much energy into devising workable standards as it has devoted to mischaracterizing the Court of Appeals' format doctrine.