**OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Silver King Broadcasting of Maryland, Inc., Family Media, Inc., Intervenors.**

**Nos. 87–1243, 88–1797 and 88–1875.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 1990.
Decided Aug. 24, 1990.

· Andrew Jay Schwartzman, with whom Gigi B. Sohn and Angela J. Campbell were on the brief, for appellants. David W. Danner, Henry Geller, and Donna Lampert also entered appearances, for Office of Communication of the United Church of Christ, et al.

Sue Ann Preskill, Counsel, Federal Communications Commission ("FCC"), with whom Daniel M. Armstrong, Associate Gen. Counsel, FCC, James F. Rill, Asst. Atty. Gen., Robert B. Nicholson, and Marion L. Jetton, Attys., Dept. of Justice, were on the brief, for appellee. C. Grey Pash, Jr., Atty., FCC, also entered an appearance, for the FCC.

John R. Feore, Jr., for intervenor Silver King Broadcasting of Maryland, Inc., in No. 87–1243 and intervenor Silver King Broadcasting of Vineland, Inc., in No. 88–1875.

Richard E. Wiley, James R. Bayes, and Jerry V. Haines entered appearances, for intervenor Family Media, Inc., in No. 87–1243.

Before EDWARDS, RUTH BADER GINSBURG, and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Office of Communication of the United Church of Christ, Action for Children's Television, the National Organization for Women Legal Defense and Education Fund, and Professor Robert Lewis Shayon (collectively, "UCC") appeal two orders of the Federal Communications Commission and petition for review of a third. In these orders, the Commission held that the statement of proposed programming submitted by the assignee of a television license need only assure the Commission that the applicant is aware of and intends to comply with its programming policies. We conclude that the Commission's orders are consistent with the Communications Act and the FCC's current policy regarding broadcast regulation. We further conclude that such a programming statement provides the Commission with sufficient information to make the statutorily required finding that the transfer or issuance of a license would serve the public interest. Finally, we affirm the Commission's waiver of its duopoly rule in approving the transfer of a television station.

## I. BACKGROUND

### A. Legal Framework

Section 301 of the Communications Act of 1934 provides that persons desiring to operate radio or television stations in the United States must obtain a license from the FCC. 47 U.S.C. § 301 (1982). Such licenses are transferable only on approval of the Commission. *Id.* § 310(d). To approve the issuance or transfer of a license, the Commission must find that "the public interest, convenience, and necessity" will be served thereby. *Id.* § 309(a), 310(d). Commission regulations formerly imposed a significant set of programming requirements on licensees and applicants. For example, they prescribed quantitative guidelines governing commercials and non-entertainment public interest programming, specified procedures for ascertaining the needs and interests of the community to be served, and established program log requirements. 47 C.F.R. §§ 0.281, 73.1800, 73.1810 (1980).

Beginning in the early 1980's, the FCC initiated several rulemaking proceedings designed to substantially reduce its regulation of commercial broadcasting. The first was addressed to the operation of radio stations. The Commission's action was based on a policy determination that broadcasters would be better able to meet the needs of the communities they served if they were freed from excessive regulation and allowed to respond to market forces. *Deregulation of Radio,* 84 F.C.C.2d 968, 971–72, 982–83, 988–92 (1981). The Commission thus eliminated, among other things, its quantitative guidelines for non-entertainment programming and commercials, its ascertainment procedures, and program log requirements. *Id.* at 971. The Commission stated, however, that it was retaining the general obligation imposed on its licensees "to offer programming responsive to public issues." *Id.*

The effect of these changes was to streamline the procedures for obtaining new licenses and transferring or renewing existing licenses. Applicants for new licenses or the transfer of existing ones were no longer required to provide detailed descriptions of proposed programming or of the manner in which issues of importance to the community would be ascertained. *Id.* at 975–99. Rather, they were required to provide only a brief description, in narrative form, of their planned program service. *Id.* at 1115. On review, this court generally upheld the Commission's innovations; it twice remanded one matter to the Commission, however, reasoning that the elimination of certain programming log requirements might deprive the public of sufficient information to evaluate whether the licensee was adequately serving the community, and thereby undermine the public's right to participate in licensing determinations. *Office of Communication of the United Church of Christ v. FCC,* 779 F.2d

702, 707–14 (D.C.Cir.1985) (*"UCC IV"*); *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1438–42 (D.C.Cir.1983) (*"UCC III"*).

In a separate rulemaking, the Commission simplified its license renewal procedures and abandoned its requirement that renewal applicants submit information about their past programming. *Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM and Television Licensees,* 49 Rad. Reg.2d (P & F) 740, *recons. denied,* 87 F.C.C.2d 1127 (1981). In affirming the Commission's action, we found that in the absence of such a submission the Commission would still have "sufficient information to make the required 'public interest' determination," in part because the licensee's actual programming practices would by then be a matter of public knowledge and interested parties would thus be well equipped to bring any deficiencies to the Commission's attention. *Black Citizens for a Fair Media v. FCC,* 719 F.2d 407, 411–17 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984).

In 1984, the Commission extended its deregulation policies to television. *Revision of Programming & Commercialization Policies, Ascertainment Requirements, & Program Log Requirements for Commercial Television Stations,* 98 F.C.C.2d 1076 (1984) (*"Commercial TV Stations"*), *recons. denied,* 104 F.C.C.2d 358 (1986). On review, we found that the Commission had not adequately explained its decision to eliminate its long-standing children's television commercialization guidelines, and remanded for further consideration of that issue. In all other respects, however, we left the Commission's action undisturbed. *Action for Children's Television v. FCC,* 821 F.2d 741, 745–47, 750 (D.C.Cir.1987).

## B. Factual Background

Home Shopping Network, Inc. ("HSN") markets a variety of products directly to consumers through live sales programs presented on television stations and cable systems throughout the day. In these programs, a host presents merchandise available for purchase, which consumers may order by telephone. In August 1986, three HSN subsidiaries (collectively, "Silver King") applied for FCC permission to acquire the licenses for television stations in Baltimore, Maryland, Cleveland, Ohio, and Vineland, New Jersey. In addition to information about its qualifications, Silver King included in each of its applications the following statement concerning its planned programming service:

> [Silver King] intends to offer programming relating to the issues of public concern facing the community of [name of city]. These issues will be addressed through a variety of non-entertainment and public affairs programming. The balance of the station's schedule will offer a unique format of twenty-four hour informational and entertainment programming.

*E.g., Baltimore 314 Application,* BALCT–860815KK, Ex. 5 (Aug. 15, 1986).

Several distributors of conventional television programming petitioned the FCC to deny Silver King's Baltimore and Cleveland applications on the grounds that its programming statement was inadequate and that its proposed programming would not serve the public interest. The FCC's Mass Media Bureau ("Bureau") dismissed the petition and granted the applications. Letter from Roy J. Stewart, Chief, Video Services Division, Mass Media Bureau, to David Dasef (Nov. 6, 1986). The Bureau reasoned that the challenged programming statement was sufficient because it demonstrated that Silver King was aware of its programming obligations, and nothing in the statement cast doubt as to its ability or intent to meet them. *Id.* at 2.

The distributors applied for review by the full Commission. At this point, UCC attempted to enter the proceedings by filing a petition to intervene and an application for review of the Bureau's decision. The Commission denied the applications for review and rejected UCC's attempt to intervene. *Family Media, Inc.,* 2 F.C.C.Rcd 2540 (1987). The Commission held that Silver King's applications fully complied with

the FCC's deregulation decisions, which required only a "brief narrative description" of proposed programming. *Id.* at 2542. The Commission reasoned that the programming statements were adequate because they demonstrated that Silver King was "cognizant of the Commission's policy requiring service to the community of license and that it intends to comply with that policy." *Id.* Finally, the Commission found that UCC was not entitled to intervene at that late stage because it had failed to present good reasons for not having participated in the proceedings, as required by FCC regulations. *Id.* at 2542–43; *see* 47 C.F.R. § 1.115(a) (1989). UCC appeals this decision in No. 87–1243.

At the same time that UCC petitioned to intervene in the Baltimore and Cleveland station proceedings, it also filed an emergency petition for declaratory relief. In it, UCC asked the Commission to declare that applications for new stations or the transfer of existing ones must indicate how the applicant proposed to satisfy its non-entertainment programming obligations by specifically describing the community issues to be addressed over a hypothetical three-month period, the hours at which they would be broadcast, and the quantity of such programming. In making its request, UCC called specific attention to the special needs of children.

In response, the Commission issued a declaratory ruling stating that an applicant's programming proposal need only "satisfy the Commission that applicants are cognizant" of its policies and intend to comply with them. *Request for Declaratory Ruling Concerning Programming Information in Broadcast Applications for Construction Permits, Transfers & Assignments,* 3 F.C.C.Rcd 5467, 5468 (1988) (*"Declaratory Ruling"*). This information, the Commission reasoned, was all that was required of an applicant under its deregulation decisions and the Communications Act generally, and further information from new applicants would be of little use in the licensing process. *Id.* at 5467–69. The FCC did not specifically address the matter of children's programming. UCC petitions for review of this decision in No. 88–1797.

Silver King's application for transfer of the Vineland station requested that the Commission waive its "duopoly rule," which proscribes common ownership of stations with overlapping service areas, because Silver King had also applied for a station in Newark, New Jersey, whose signal overlapped a portion of the Vineland station's signal. *See* 47 C.F.R. § 73.3555(a)(3) (1989). Silver King's Vineland application and waiver request were unopposed. On December 22, 1986, the Commission granted the application and waiver. *Silver King Broadcasting of Vineland, Inc.,* 2 F.C.C.Rcd 324 (1986). The Commission reasoned that the two stations served different markets (New York and Philadelphia), that the overlapped area was served by many stations, and that Silver King could "enhance" the "economic viability" of the two stations, which had been struggling financially. *Id.* at 324–25.

UCC sought to enter this proceeding by petitioning for reconsideration; in its petition, UCC challenged the programming statement in Silver King's Vineland application and the Commission's waiver of the duopoly rule. The Commission dismissed UCC's petition, again holding that UCC had not shown good reason why it could not have participated in the proceeding earlier. *Press Broadcasting Co.,* 3 F.C.C.Rcd 6640, 6640–41 (1988) (citing 47 C.F.R. § 1.106(b)(1)). The Commission nevertheless addressed the merits of UCC's petition and reaffirmed its waiver of the duopoly rule. *Id.* at 6641. UCC appeals this decision in No. 88–1875.

## II. DISCUSSION

UCC challenges the Commission's determination that an applicant's programming statement need only assert that the applicant understands and intends to comply with its obligation to address issues of local concern. A requirement so insubstantial, UCC argues, is inconsistent with both the Communications Act and the Commission's deregulation decisions. UCC also contends that the Commission's waiver of its duopoly rule for Silver King's Vineland applica-

tion was arbitrary, capricious, and an abuse of discretion. The Commission answers that it properly rejected UCC's attempts to intervene in the Silver King application proceedings as untimely under its rules, that its determination to accept programming statements such as Silver King's was reasonable, and that it properly found that waiver of the duopoly rule would serve the public interest. We address each contention in turn.

## A. Administrative Exhaustion

■ Before reaching the merits of UCC's arguments, we first consider the Commission's claim that it properly dismissed UCC's filings as untimely. Section 405 of the Communications Act provides that nonparties adversely affected by an FCC decision may petition for reconsideration and, having done so, may obtain judicial review. 47 U.S.C. § 405 (1982); *see also id.* § 402(b)(6). FCC regulations, however, provide that a person who has not participated in the earlier stages of a proceeding may apply for review or petition for reconsideration of an adverse decision only if that person "show[s] good reason why it was not *possible* for him to participate in the earlier stages of the proceeding." 47 C.F.R. §§ 1.106(b)(1), 1.115(a) (1989) (emphasis added). Underlying these regulations are principles of finality and exhaustion of administrative remedies: Interested persons seeking to participate in FCC proceedings are required to join the proceedings at the earliest opportunity. *See Spanish Int'l Broadcasting Co. v. FCC*, 385 F.2d 615, 624–28 (D.C.Cir.1967); *Valley Telecasting Co. v. FCC*, 336 F.2d 914, 917–19 (D.C.Cir.1964); *Springfield Television Broadcasting Corp. v. FCC*, 328 F.2d 186, 188–89 (D.C.Cir.1964).

We have construed section 405 as incorporating the judicially created doctrine of exhaustion of administrative remedies as well as its traditionally recognized exceptions. *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 681–82 (D.C.Cir.1983) (*"WATCH"*). Under the doctrine, "courts [have] some discretion to waive exhaustion." *Id.* at 681. We must thus consider whether the doctrine pre-

cludes our considering the merits of UCC's appeals of the Commission's decisions approving the Baltimore and Cleveland applications (No. 87–1243) and waiving its duopoly rule in the case of the Vineland application (No. 88–1875).

## 1. The Baltimore and Cleveland Applications

■ UCC sought to justify its late entry into the Baltimore and Cleveland proceedings by asserting that it became aware of the Commission's new position on the content of program statements only by virtue of the Bureau's November 6, 1986 decision. Finding that UCC had not shown good reason for failing to participate in the proceeding before the Bureau, the Commission decided that UCC's application for review more closely resembled a late-filed petition for reconsideration of its change in policy (presumably, its deregulation decisions) than an application for review seeking reversal of the Bureau's decision applying the new policy to a specific set of facts. *Family Media, Inc.*, 2 F.C.C.Rcd at 2542–43.

On appeal, the Commission contends that surprise at the Bureau's decision does not constitute a sufficient reason for late intervention. *See Committee for Community Access v. FCC*, 737 F.2d 74, 84 (D.C.Cir. 1984). The Commission did not articulate this rationale, however, when it dismissed UCC's application. *See Family Media, Inc.*, 2 F.C.C.Rcd at 2542–43. Nevertheless, we need not decide whether the Commission properly dismissed UCC's application, because an exception to the exhaustion doctrine permits UCC to appeal the merits of the Commission's decision affirming the Bureau.

In *UCC IV*, we noted that a person who had not participated in the original proceedings could obtain judicial review of a Commission order, provided that the issues pursued on appeal were substantially the same as those raised by other parties. 779 F.2d at 706–07. Silver King's Baltimore and Cleveland applications were opposed before both the Bureau and the Commission by

the program distributors, who raised essentially the same arguments regarding Silver King's programming statements that are now being urged by UCC. In its decision affirming the Bureau, the Commission noted and rejected these arguments. *Family Media, Inc.,* 2 F.C.C.Rcd at 2541–42. UCC may therefore properly appeal the Commission's decision approving the Baltimore and Cleveland transfers. *See UCC IV,* 779 F.2d at 707.

### 2. The Vineland Application

■ Silver King's Vineland application was not opposed until UCC petitioned the Commission for reconsideration of its decision granting the application. UCC's petition, which relied in part on evidence of post-acquisition programming practices, challenged both the Commission's acceptance of Silver King's programming statement and its waiver of the duopoly rule. UCC argued that its petition was timely because it could not have anticipated that the Commission would approve the Vineland application. The Commission, however, dismissed UCC's petition for failure to show good reason why it had not previously participated in the proceeding and stated, furthermore, that post-licensing events were not relevant to the correctness of the Commission's earlier decision. *Press Broadcasting Co.,* 3 F.C.C.Rcd at 6640–41. The Commission nevertheless went on to address the merits of the duopoly waiver. *Id.* at 6641.

As we stated in *Meredith Corp. v. FCC,* "[a]s a condition precedent to judicial review, section 405 requires only that the Commission have a 'fair opportunity' to pass on [an] issue." 809 F.2d 863, 870 (D.C.Cir.1987). UCC's petition for reconsideration left the Commission with the requisite fair opportunity to consider UCC's objections to the duopoly waiver. Because the Commission " 'in fact considered the issue,' " *UCC IV,* 779 F.2d at 706 (quoting *WATCH,* 712 F.2d at 682), UCC's challenge to the waiver falls within the same exception to the exhaustion doctrine and may therefore be reviewed.

### B. The Programming Statements

■ We turn now to the issue of the requisite level of detail to be included in an applicant's statement of proposed programming. Although the Communications Act provides that a station license may not be transferred unless the Commission finds that the transfer would serve the "public interest, convenience, and necessity," 47 U.S.C. § 310(d), it does not define those terms. Rather, the Act delegates the task of determining how the public interest will best be served to the Commission, and its judgment in this regard "is entitled to substantial judicial deference." *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981); *accord Black Citizens,* 719 F.2d at 413.

■ The Communications Act does not direct the Commission to conduct a specific inquiry into an applicant's proposed programming. *See Black Citizens,* 719 F.2d at 412. Rather, section 308(b), which is made applicable to transfer applications by section 310(d), provides that applications "shall set forth such facts as the Commission by regulation may prescribe" as to considerations such as the citizenship, character, technical and financial qualifications of the applicant, "and such other information as [the Commission] may require." 47 U.S.C. § 308(b). The Commission then decides, based on the information submitted in the application and "such other matters as [it] may officially notice," whether the grant of an application will serve the public interest. *Id.* § 309(a).

■ The Commission has broad discretion not only to define the public interest, but also to determine which *procedures* will best assure its protection. *Black Citizens,* 719 F.2d at 413. From time to time, the Commission has revised its informational requirements as its view of the public interest changes. *See id.* at 412. This it is free to do. The Commission may, in its discretion, reconsider its views as to the means needed to protect the public interest, provided that it adequately explains any changes made and that it has sufficient information to make the required public interest determination. *See id.* at 411, 413.

In its deregulation decisions, the FCC abandoned its requirement that applicants submit detailed information concerning their proposed programming. Instead, the Commission directed applicants to provide a brief narrative statement. As UCC points out, the Commission's declaratory ruling essentially reduces this programming statement to mere "boilerplate," a simple certification that the applicant understands and will comply with its public service obligations. It is far from clear, however, that the required certification is not sufficient to enable the Commission to conclude that granting the license would serve the public interest.

The Commission offered two principal reasons in support of its new policy. First, it reasoned that to require a more detailed statement would be inconsistent with the revised regulatory scheme established in its deregulation decisions. *Declaratory Ruling*, 3 F.C.C.Rcd at 5468. The Commission explained that "a programming proposal is merely a prediction of future service," while a more detailed statement would tend to operate as a promise, locking an applicant into a proposed programming format and defeating an essential element of the new regulatory regime; namely, that broadcasters be allowed flexibility "to adapt programming to [a] changing marketplace." *Id.* at 5468, 5470 n. 10.

Second, the Commission explained that more detailed programming proposals were not useful to either the Commission or interested parties in evaluating a prospective licensee's application because of their hypothetical nature, the sometimes long delays between their formulation and the commencement of service, and the Commission's historical reluctance to pass judgment on the substance of a licensee's programming. *Id.* at 5468–69. Thus, the Commission concluded that its concern was properly limited to whether a prospective licensee was committed to complying with the Commission's rules and policies regarding programming.

█ We are satisfied that the Commission has adequately explained why the programming statement it now requires is suf-

ficient to enable it to meet its statutory responsibilities. Moreover, its explanation of the nature and purpose of that statement is consistent with the policy set forth in its deregulation decisions. The *Declaratory Ruling* embodies the Commission's first elaboration of the narrative statement requirement set forth in those decisions and represents a logical extension of the policies expressed therein.

The Communications Act imposes on licensees an obligation to provide non-entertainment programming responsive to issues of concern in the community to be served. *UCC III*, 707 F.2d at 1429. The Commission's deregulation decisions continue to emphasize this obligation. *See, e.g., Commercial TV Stations*, 98 F.C.C.2d at 1091–92. Nevertheless, the Commission concluded that its programming guidelines had become anachronistic and that the public interest would be better served by allowing market forces to determine the licensee's programming mix. *Id.* at 1087–88. The Supreme Court has expressly approved such a policy judgment with respect to entertainment programming. *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 600–03, 101 S.Ct. 1266, 1277–78, 67 L.Ed.2d 521 (1981).

Accordingly, the Commission eliminated the guidelines and the detailed program descriptions mandated by them and substituted instead a simple requirement that applicants provide "a narrative statement of their proposed programming." *Commercial TV Stations*, 98 F.C.C.2d at 1116 (revising 47 C.F.R. § 0.283(a)(7)(i)(A)); *see also Deregulation of Radio*, 84 F.C.C.2d at 1015, 1114–15 (implementing change for AM and FM license applicants). Its deregulation decisions, however, did not indicate the scope, content, or level of detail such "narrative statements" should contain.

On their face, the words "narrative statement" seem to call for something more than a mere certification that the applicant is aware of and intends to comply with the Commission's programming policies. Language in *Deregulation of Radio* tends to support such a hypothesis:

[W]here applicants are being considered without comparative challenge, any interested party will have the applicant's program proposal and be in a position to judge the responsiveness of that proposal.

84 F.C.C.2d at 998. This statement implies that an applicant's proposed programming statement should contain sufficient substance to allow the Commission and interested parties to gauge how responsive the applicant's programming will be to community needs.

In its subsequent ruling, however, the Commission disavowed any such intention, stating that

[t]o the extent [this] statement can be read to imply that a specific, detailed programming proposal is required, we believe it is inconsistent with the action adopted in [*Deregulation of Radio*] and the Commission's general approach to programming regulation.

*Declaratory Ruling*, 3 F.C.C.Rcd at 5468. In it, the Commission provides, for the first time, a detailed explanation of what a "narrative statement" should consist of and why. This discussion does not reflect a change in the Commission's interpretation of the requirement. Rather, it represents an elaboration of its approach to programming that is fully consistent with the policy expressed in *Deregulation of Radio;* namely, that broadcasters should be allowed the flexibility to meet community needs in response to market forces. 84 F.C.C.2d at 978. As the Commission's ruling is based on a consistent and logical extension of the principles underlying the deregulation decisions, we find it to be a reasonable exercise of the Commission's policymaking discretion.

UCC argues that programming statements that merely certify an applicant's intent to comply with the Commission's policies do not provide interested parties such as itself with sufficient information to participate meaningfully in the licensing process. Under the Communications Act, a party objecting to the grant of a license must file a petition to deny which "shall contain specific allegations of fact suffi-

cient to show ... that a grant of the application would be prima facie inconsistent" with the public interest, convenience, and necessity. 47 U.S.C. § 309(d); *see UCC IV,* 779 F.2d at 708–09 (to establish prima facie case, petitioner must file affidavits alleging specific facts demonstrating failure to address issues of public concern). As we accept as reasonable the Commission's conclusion that detailed statements of proposed programming are not necessary to its determination whether to grant an application, we must also reject UCC's argument that the denial of such information infringes on its right of participation. Material that is not useful to the FCC in the first instance can hardly form the basis for an interested party's challenge to its grant of an application.

Contrary to what UCC suggests, our decision in *UCC IV* is not at odds with this conclusion. In that case, we found that the record-keeping requirements imposed on licensees regarding their non-entertainment public interest programming were not sufficient to enable interested persons to participate in license renewal proceedings. *Id.* at 707–14; *see also Black Citizens,* 719 F.2d at 414 (elimination of specific programming questions from renewal process reasonable because licensee's past programming practices provide public and Commission with sufficient information to assess whether renewal in public interest). As the cases before us involve applications for the transfer of licenses to new owners, there is no relevant programming history to be consulted in determining whether the transfer is in the public interest.

UCC also complains that the *Declaratory Ruling* fails to address the question of children's programming, which it specifically mentioned in its Emergency Petition. As the FCC points out, however, the *Declaratory Ruling* requires that an applicant demonstrate that it is aware of and intends to comply with the Commission's programming policies. 3 F.C.C.Rcd at 5468. Those policies include the specific obligation of *each* broadcaster to provide programming responsive to "the specialized needs of children" as part of its broader "bedrock obligation ... to be responsive to the needs and interests of its communi-

ty." *Children's Television Programming & Advertising Practices*, 96 F.C.C.2d 634, 656 (1984) (determining that the market functioned adequately to regulate the quantity and quality of children's television programming, and declining to impose specific children's programming guidelines), *aff'd, Action for Children's Television v. FCC*, 756 F.2d 899 (D.C.Cir.1985) (per curiam). We see no reason for requiring special treatment, in an applicant's programming statement, for this component of a prospective licensee's public interest obligations.

The nature and scope of those obligations are readily ascertained. The Commission has collected and indexed its programming policies (together with its other policies) in an easily understandable format at the end of part 73 of its regulations. *See* 47 C.F.R. §§ 73.4000–.4280 (1989) (listing FCC policies by reference to their source). These sections provide a ready reference point from which applicants may familiarize themselves with the Commission's programming requirements. It is thus entirely reasonable to expect applicants to be able to affirm their awareness of the Commission's policies.

C. The Duopoly Rule

▉ The Commission's duopoly rule is designed to promote competition among stations as well as diversity of views. *See Multiple Ownership of Standard, FM and Television Broadcast Stations*, 22 F.C.C.2d 306, 307 (1970), *recons.*, 28 F.C.C.2d 662 (1971). In establishing the duopoly rule, the Commission retained the power to waive it in cases where its application would be "inappropriate." *Multiple Ownership of Standard, FM and Television Broadcast Stations*, 2 Rad.Reg.2d (P & F) 1588, 1594 n. 12 (1964). The Commission has granted such a waiver in cases where the signal overlap is *de minimis, see, e.g., John Hay Whitney*, 28 F.C.C.2d 736, 752 (1971), or where the public interest to be gained from waiving the rule would be greater than any detrimental effects resulting from the overlap. *Capital Cities Communications, Inc.*, 59 Rad.Reg.2d (P & F) 451, 464–65 (1985).

In this case, we find that the Commission reasonably concluded that the balance of interests tipped in favor of granting Silver King's request for a waiver. *In re Press Broadcasting Co.*, 3 F.C.C.Rcd at 6641; *Silver King Broadcasting of Vineland, Inc.*, 2 F.C.C.Rcd at 324–25. Although the Commission observed that the overlap from the Vineland and Newark stations would not be *de minimis*, it found that the two stations were in separate, highly competitive markets, that the overlapped area was served by many stations located in both markets, and thus that an undue concentration of economic power would not result. 3 F.C.C.Rcd at 6641; 2 F.C.C.Rcd at 325. Although the Commission did find that the waiver would result in a marginal decrease in the diversity of viewpoints serving the overlapped area, it concluded that this detriment was outweighed by "the potential for strengthening financially weak television outlets in highly competitive markets at the hands of a new owner committed to meeting local needs." 3 F.C.C.Rcd at 6641. Given the deference due the agency in matters of this sort, we see no basis for finding that the Commission's waiver of the duopoly rule was arbitrary or capricious.

III. CONCLUSION

We conclude that we are not precluded by section 405 of the Communications Act and the judicial doctrine of exhaustion of administrative remedies from considering any of UCC's arguments. We hold that the Commission's explanation of the nature of its programming statement requirement is adequate and represents a reasonable exercise of its authority to structure its procedures so as to ensure that the public interest will be served. We further hold that the Commission's decision to waive its duopoly rule and grant Silver King's Vineland application was reasonable. We therefore affirm the Commission's decisions under review in Nos. 87–1243 and 88–1875 and deny the petition for review in No. 88–1797.

*So ordered.*